612 June 19, 2014 No. 43

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL SPENCER WASHINGTON, JR.,
*Defendant-Appellant.*

(CC CR0701950; SC S058490)

En Banc

On automatic and direct review of the judgment of conviction and sentence of death imposed by the Clackamas County Circuit Court.

Thomas Rastetter, Judge.

Argued and submitted June 4, 2013.

Bronson D. James, JDL Attorneys, LLP, Portland, argued the cause and filed the briefs for defendant-appellant.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for plaintiff-respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, Christina M. Hutchines and Jeremy C. Rice, Assistant Attorneys General.

LANDAU, J.

The judgment of conviction and sentence of death are affirmed.

**LANDAU, J.**

This case is before the court on automatic and direct review of defendant's judgment of conviction and sentence of death for aggravated murder. ORS 138.012(1). On review, defendant challenges 22 rulings the trial court made during the guilt and penalty phases of his trial. He asks this court to reverse his convictions for aggravated murder and felon in possession of a firearm and remand for a new trial or, alternatively, to vacate his sentence of death and remand for resentencing. We affirm both the conviction and the sentence.

## I.  BACKGROUND

We begin with an overview of relevant facts and describe additional facts in our discussion of defendant's assignments of error. Because the jury found defendant guilty, we view the evidence presented at trial in the light most favorable to the state. *State v. Bowen*, 340 Or 487, 489, 135 P3d 272 (2006), *cert den*, 549 US 1214 (2007).

In 1991, defendant began a relationship with Stafford. They had two children together. At various times over the years, defendant and Stafford lived apart from each other, and, during those times, each dated other people. Defendant, however, did not approve of Stafford dating others.

In 2004, defendant and Stafford were living apart, and the children lived with Stafford. In the meantime, Stafford met Mohamed Jabbie, the victim in this case, and the two began seeing each other romantically.

In July of that year, defendant learned of Stafford's relationship with Jabbie. Early in the morning of July 4, while Stafford and Jabbie were in Stafford's home, defendant tried to call Stafford, but she refused to answer the telephone. Moments later, the bedroom window shattered. Stafford jumped out of the bedroom window and ran to a neighbor's house. She returned to her house when the police arrived and found that two doors had been kicked off of their hinges. Jabbie was not there. Stafford found Jabbie at a hospital emergency room where he was being treated for

various injuries. Following the July 4 incident, Stafford continued to see Jabbie.

A few weeks later, Stafford and defendant spoke by phone. Stafford accused defendant of having broken into her home and told him that he needed to pay for the damage "or else he was going to jail." Defendant admitted to Stafford that he had broken into her apartment and that he had assaulted Jabbie. But he replied that he was not going to jail, "[n]ot without a witness." Stafford immediately called Jabbie to warn him that his life was in danger because he had been a witness to the July 4 incident. Defendant later met with Stafford and asked her to "help him take Jabbie out." Stafford refused, and defendant told her that he would "do it himself."

A grand jury convened to investigate the July 4 incident. The grand jury subpoenaed Stafford and Jabbie to testify about the incident. Defendant knew that Stafford had been subpoenaed to testify. He went to her house and tried to convince her to lie to the grand jury, threatening to kill her and to take her children if she did not. He also asked her to show him where Jabbie lived. Fearing what defendant might do if she refused, Stafford showed him where Jabbie lived, an apartment located near Clackamas Town Center in Portland.

On September 23, Stafford testified to the grand jury. Later that evening, she spoke with defendant by telephone. Defendant told Stafford that he wanted her to go to Jabbie's apartment. He told her to meet him at Clackamas Town Center.

Stafford arrived at the shopping center and called defendant's cell phone from a public phone booth, but received no answer. When defendant arrived a few minutes later, he gave Stafford one of his two cell phones. He told her to go to Jabbie's apartment and then call him as she was leaving. He told her not to use the cell phone to call Jabbie, however.

Stafford went to Jabbie's apartment, but he was not at home. She returned to Clackamas Town Center and called Jabbie from the same public telephone she had used to call defendant. Jabbie answered and agreed to meet with

her. Stafford told defendant that Jabbie was at home and that she was going to meet him.

Stafford drove to Jabbie's apartment and met him in the parking lot. The two then went upstairs to the apartment. Stafford was nervous because she "knew what was coming." While she was in the apartment talking to Jabbie, the cell phone that she had in her possession, which was on silent mode, showed several calls from defendant, which she did not answer.

After about 15 minutes, Stafford left Jabbie's apartment and placed a call to defendant as defendant had instructed her. When she opened the door to the apartment, however, defendant was already standing outside the door. He passed by her and went into the apartment. On her way down the stairs, Stafford greeted a woman. As she approached her car in the parking lot, Stafford "heard several gunshots back to back."

In the meantime, at about 10:30 that night, two of Jabbie's neighbors, Grooms and Alcantara, had stepped outside their apartment to smoke some cigarettes. They heard an argument in Jabbie's apartment. They then observed a woman whom they later identified as Stafford come out of Jabbie's apartment, go down the stairs, and walk away. A minute later, they heard several gunshots and saw flashes through the window of Jabbie's apartment. Shortly after the shots, they saw a black male generally matching defendant's age, height, and weight leave Jabbie's apartment, go down a set of stairs at the back of the apartment building, and briskly walk away.

There ensued several phone calls between Stafford and defendant. The two met later that night, and Stafford returned defendant's cell phone to him.

A few days later, Stafford asked defendant where he had shot Jabbie. Defendant replied that he had shot him in the chest. Defendant also told Stafford that his cousin had disassembled and disposed of the gun.

On September 28, police discovered Jabbie's body, shot seven times in the chest. When the discovery was

reported on television, defendant called Stafford and told her to watch the news, where she saw a picture of Jabbie.

Police investigated Jabbie's murder. Among other things, police obtained telephone records for defendant's cell phone for the day of the murder. Those records showed that, on that day, several telephone calls were made to defendant's cell phone, including two from a payphone located at Clackamas Town Center and several others between defendants' two cell phones placed between 10:00 p.m. and 10:30 p.m. using cell towers located within two blocks of Clackamas Town Center.

On September 30, 2004, police stopped Stafford in her car and asked about Jabbie's death. She admitted that she had been at Jabbie's apartment and at Clackamas Town Center on the night of September 24. She denied having seen defendant after July 4 and denied having any involvement in, or knowledge of, Jabbie's murder. Meanwhile, defendant and Stafford continued their relationship for the next three years.

Police arrested defendant and Stafford for Jabbie's murder in 2007. When detectives first interviewed Stafford, she lied about being involved with defendant and being involved in Jabbie's murder. She later agreed to testify against defendant in exchange for dismissal of the aggravated murder charge against her.

Defendant was charged with two counts of aggravated murder, ORS 163.095, one count of murder, ORS 163.115, and three counts of felon in possession of a firearm, ORS 166.270. He was tried to a jury on the aggravated murder and murder counts and to the court on the felon-in-possession counts. He was found guilty on all counts. In a further proceeding under ORS 163.150, the jury answered the applicable penalty-phase questions in the affirmative. ORS 163.150(1)(b)(A), (B), (D). The trial court merged the murder and aggravated murder convictions into one conviction for aggravated murder, merged the three convictions for felon in possession into one conviction for that crime, entered a judgment of conviction, and sentenced defendant to death. This automatic and direct review followed.

## II.   ANALYSIS

As we have noted, on review, defendant advances a total of 22 assignments of error concerning rulings of the trial court during both the guilt and penalty phases of the trial. We address each of those assignments in turn, detailing additional facts relevant to those assignments as necessary.

A.   *Motions for Judgment of Acquittal (Assignments 1-5)*

At trial, defendant moved for a judgment of acquittal as to all six counts. He argued that the state's case failed for lack of sufficient evidence. Specifically, he argued that the state's case relied almost entirely on the testimony of Stafford, and, because Stafford was an accomplice in Jabbie's murder, that evidence was insufficient. According to defendant, ORS 136.440 provides that the testimony of an accomplice must be corroborated by other evidence. In this case, he argued, the state failed to introduce any such corroborating evidence other than cell phone records. In defendant's view, that evidence was inadequate to provide the required corroboration, because the state failed to establish that defendant possessed either of the cell phones at the time that the calls were made on the date of the murder. The state responded that, while the statute does require corroborating evidence, there is in this case "evidence in droves" connecting defendant to Jabbie's murder. The trial court denied defendant's motions without elaboration.

On appeal, defendant now assigns error to the trial court's denial of his motion for a judgment of acquittal as to the first five charges against him.[1] Specifically, defendant argues, as he did below, that the state's case relied almost entirely on the testimony of his accomplice, Stafford, and that there was insufficient evidence to corroborate her testimony, as required under ORS 136.440. Defendant begins by asserting that the statute requires a reviewing court to eliminate any reference to the testimony of the accomplice

---

[1] As we have noted, the indictment included six counts. Defendant's brief on appeal assigns error to the denial of his motion for judgment of acquittal as to only the first five. Given our disposition of the assignments of error that he does advance, however, the failure to assign error to the denial of a motion for a judgment of acquittal as to the final charge does not matter.

and then determine whether the remaining evidence suffices to connect him to the offense. Moreover, he argues, the remaining evidence "cannot be equivocal"; rather, it must be certain and "inconsistent with innocence." In that regard, defendant argues that evidence that establishes mere association with the accomplice or that establishes that defendant was only in the general vicinity of the offense is insufficient to corroborate the testimony of an accomplice. With that view of the law in mind, defendant then argues that the evidence other than Stafford's testimony was "virtually non-existent," consisting of cell phone data that established "mere association and location."

The state responds that defendant is incorrect in asserting that the court must completely disregard Stafford's testimony and determine whether independent evidence establishes defendant's guilt. What the statute requires, the state argues, is other evidence that "tends to connect" defendant with the commission of the offense. In that regard, the state argues that there is ample evidence that connects defendant with Jabbie's murder, including evidence that defendant had previously broken into Jabbie's apartment and assaulted Jabbie; that Jabbie was scheduled to be a witness in the case against him arising out of that incident; that witnesses saw Stafford leave Jabbie's apartment shortly before the shooting, followed by a man generally matching defendant's description after the shooting; and evidence showing the use of defendant's cell phones at the time of the murder, which precisely corroborates Stafford's testimony about her movements and defendant's movements before, during, and after the shooting.

ORS 136.440 provides:

"(1)   A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances of the commission.

"(2)   As used in this section, an 'accomplice' means a witness in a criminal action who, according to the evidence adduced in the action, is criminally liable for the conduct of the defendant under ORS 161.155 and 161.165 * * *."

In this case, the parties do not dispute that Stafford was an "accomplice" within the meaning of subsection (2). Her testimony, therefore, is insufficient to support a conviction unless it was "corroborated by other evidence that tends to connect the defendant with the commission of the offense," as required in subsection (1).

At the outset, we reject defendant's contention that ORS 136.440 requires "unequivocal" evidence that is "inconsistent with innocence" and establishes, independently of the testimony of the accomplice, defendant's guilt. This court has long held that

> "[t]he corroboration need not be of itself adequate to support a conviction *** 'Any corroborative evidence legitimately tending to connect a defendant with the commission of the crime may be sufficient to warrant a conviction, although standing by itself it would be only slight proof of defendant's guilt and entitled to but little consideration, and even though it is not wholly inconsistent with the innocence of the defendant.[']"

*State v. Reynolds*, 160 Or 445, 459, 86 P2d 413 (1939). Consistently with those principles, the court more recently summarized the requirements of ORS 136.440 as follows:

> "By its terms, ORS 136.440(1) requires only that the corroborating evidence tend to connect the defendant with the commission of the offense, here, aggravated murder. That statute does not require corroboration of a particular *theory* of the commission of the offense.
>
> "It is not necessary that the corroborating evidence be direct and positive; it may be circumstantial. Nor is it necessary that there be independent corroborating evidence with respect to every material fact necessary to be established to sustain a conviction for the commission of a crime. Where there is any evidence apart from that of the accomplice tending to connect the defendant with the commission of the crime, the question of whether the accomplice's testimony is corroborated is one for the trier of fact."

*State v. Walton*, 311 Or 223, 242-43, 809 P2d 81 (1991) (citations omitted; emphasis in original). To be sure, evidence of a defendant's association with an accomplice at a particular location, *by itself*, is insufficient to satisfy the corroboration

requirement of ORS 136.440. *State v. Carroll*, 251 Or 197, 200, 444 P2d 1006 (1968). But such evidence still may be considered in conjunction with other evidence that, taken as a whole, tends to connect the defendant with the commission of the offense. *See id.*

With those principles in mind, we conclude that the record contains sufficient evidence to corroborate Stafford's accomplice testimony relating to the commission of Jabbie's murder. There is evidence that defendant broke into Jabbie's apartment on July 4, 2004, and assaulted Jabbie. There is further evidence that Jabbie testified before a grand jury about the incident and that, the day before the murder, the grand jury issued an indictment charging defendant with first-degree burglary and fourth-degree assault. The evidence at trial thus established that defendant had assaulted Jabbie once and had motive to assault him—a key witness against defendant—the day after the indictment was issued. *See State v. Klein*, 243 Or App 1, 12, 258 P3d 528 (2011), *aff'd*, 352 Or 302, 283 P3d 350 (2012) (accomplice's "rendering of the motive for the crimes" was confirmed by other evidence relating to the events giving rise to the alleged motive).

In addition, the evidence at trial included the testimony of Grooms and Alcantara, who saw Stafford leave Jabbie's apartment at about 10:30 p.m., heard gunshots fired moments later, and witnessed flashes through the window of Jabbie's apartment. They also saw a man generally matching defendant's description leave the apartment immediately after that.

The evidence at trial also included cell phone data corroborating precisely Stafford's testimony about her and defendant's movements the night of the murder. Specifically, the cell phone records show that a number of calls were placed to defendant's cell phone, including two from a pay phone located at Clackamas Town Center and several others between defendant's two cell phones placed between 10:00 p.m. and 10:30 p.m. using cell towers located within two blocks of Clackamas Town Center. Taken in isolation, the cell phone data constitute mere association and location evidence, as defendant suggests. But in the context of the other evidence, it "tends to connect" defendant with the murder.

In evaluating the sufficiency of the foregoing evidence, we stress that ORS 136.440(1) does not require complete corroboration of all of the elements of the offense. Nor does it require that corroborating evidence be direct and unequivocal. As this court emphasized in *Walton*, where there is "any evidence * * * tending to connect" the defendant with the commission of the offense, the question whether evidence corroborates the accomplice's testimony is one for the trier of fact. 311 Or at 243. The evidence produced in this case meets that standard. The trial court therefore did not err in denying defendant's motions for judgment of acquittal on the first five charges against him.

B.   *Use of Stun Device (Assignment 6)*

In his sixth assignment, defendant asserts that the trial court erred in ordering that he wear a stun device during trial. The facts relevant to that assignment are as follows. In a pretrial hearing, the Clackamas County Sheriff's Office required defendant to appear in court wearing a stun device. Defendant also learned that he would be required to wear a similar device during the trial. He objected, arguing that requiring him to wear a stun device during trial would violate his right to communicate with counsel and assist in his defense as guaranteed by Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

The trial court held a hearing on defendant's objection. At that hearing, the state offered the testimony of Sergeant Phillips of the sheriff's office in support of requiring defendant to appear in court wearing a stun device. Phillips explained that the sheriff's office was responsible for security at the courthouse. He testified that defendant was a member of a gang, that he had "about 40 to 50" associates, and that the sheriff's office was concerned that—either working alone or in concert with defendant—those persons might aid him in escaping from the courthouse; when asked, he agreed that gangs like the one with which defendant was associated "use power, influence, and violence to intimidate others." Phillips also agreed that, based on defendant's "athletic ability and strength," he was capable of overpowering a deputy in the courtroom. The deputy was aware of

the charges in the case and that defendant had a "criminal history of violence" and agreed that defendant's reported threats against Stafford were a "concern." Phillips stated that defendant was classified as a "dangerous inmate" and that he was aware that defendant had told a deputy at the jail that the deputy was "not his boss." He said that, without the use of the stun device, he could not "assure" the security of the courtroom. He noted that, in the courtroom, there would be numerous persons within 30 feet of defendant and that defendant could cover that distance in the time it would take a deputy to react.

Phillips also described the stun device that the sheriff's office planned to use. The device was manufactured by the Stinger Company and was called a "React Band-it." It was rectangular in shape and approximately four inches wide, six inches high, and one and one-half inches deep; it weighed approximately one pound. The device was meant to be worn on a limb or on the lower back underneath the subject's clothing. It was classified as a "neuromuscular incapacitation" device that used "high levels of voltage with very low amperage" to deliver an electric shock to the wearer. Typical effects caused by activation of the device included pain, loss of mental focus, and uncontrollable muscle contractions in the area of the body where the device was located; Phillips testified that "people tend to fall down when they're shocked" and "make loud noises" and that "[s]ome people freeze up in place." He also explained that, more rarely, persons urinate or defecate when shocked. Phillips noted that defendant would be able to walk with the device in place and that, depending on the cut of his clothing, the device would not be visible to the jury. He said that the device could only be activated by the deputy holding the triggering device.

Phillips further testified that the "next most restrictive device" that was available was shackles and that those would be "observable," and that a leg brace which could be worn under clothing was not "reliable" in preventing a defendant from escaping custody. He stated that other available security devices included handcuffs, fabric hobbles, Tasers, pepper spray, "impact weapons," and firearms. Phillips described the "general nature" of security in the court

building, including the fact that it had multiple unlocked exits.

On cross-examination, Phillips testified regarding a notification form that persons signed when the device was used. The form explained the results of activation of the device, including falling to the ground and the "possibility" of "self-urination" and "self-defecation." The form also indicated that certain medical conditions were relevant to the decision whether to use the device, including heart disease, multiple sclerosis, and pregnancy. The form listed the types of actions by a wearer of the device that might result in its activation, including "any outburst or quick movement," "any hostile movement," "tapping of the belt," failure to comply with verbal commands, any attempt to escape custody, the custodial deputy's "loss of vision[]" of the wearer's hands, and "any overt act against any person or deputy."

When asked whether defendant would be "conscious of the fact that you have this on," Phillips responded, "Yes." He confirmed that, as he had testified on direct examination, the plan to require defendant to wear the stun device was based in part on the "possibility," not the "probability," of "gang activity." Phillips was not aware of any history of escape attempts, violence in the jail, or "acting out in a courtroom" by defendant. He testified that it "could be" that someone in the courtroom could see the deputy holding the triggering device.

Defendant argued to the trial court that there was nothing to suggest that he was an escape risk or that he was dangerous in the current proceeding. He asserted that, "[w]hen you talk about gang activity it's speculative." He argued that the device "would be likely to inhibit his ability to assist in his own defense" and that it would be an "imposition" on his ability to testify. He argued that there was no factual basis for the use of the device and that the court was required to consider "lesser" alternatives.

The trial court found and ruled as follows:

"*** that [defendant] is a convicted felon and also has a history of convictions of person crimes involving violence; that in this case [defendant] faces a—if he is convicted

faces a substantial sentence and the risk of the death penalty; that [defendant] has a history of gang contacts and affiliations; that [he was] alleged to have intimidated witnesses in this case, and to have murdered a witness regarding charges in [another county]; that we have a lack of a secure courtroom; that there are exits from courtrooms into public areas, and many exits from the courthouse to the street; that the defendant if he were not encumbered in some way he would have a means of escape if there were no security device; that he will be in civilian clothing which would aid in his escape; that the Sheriff's Department cannot guarantee security in this case without some sort of device; [g]iven the defendant's size and physical capacities [defendant] poses the risk of overpowering a deputy or a witness if he's not restrained; that given the facts of this case it would be difficult for law enforcement or personnel [*sic*] to identify any of [defendant's] confederates that might be present in the courtroom; that the stun device will be operated only by trained personnel; that the device * * * will not be visible under clothing; that the defendant will be seated at counsel table furthest away from the jury so as to minimize any possibility that something might be visible; that unless the device was activated it would not impede the defendant's movements or ability to consult with his attorney; that this device is the least visible, least intrusive means of providing the security necessary for this trial; that because of these factors the defendant poses an immediate and serious risk of escape during the trial and [an] immediate and serious risk of disrupting the proceedings, and that because of all those [factors], the Stinger React Band-it, [is] an appropriate device for security in this case."

After the trial court made those findings, Phillips further explained that the deputy holding the triggering device would be in uniform and that, in his experience, members of the public would not recognize the triggering device as part of a stun device system. The trial court ordered that the deputy holding the triggering device be in uniform. The next day, before jury selection began, the trial court found that the device, which was on defendant's leg, was not visible and that the hands of the deputy holding the triggering device "would probably not be visible to the jurors." The trial court made a similar finding at the beginning of each day of trial.

On review, defendant again contends that use of the stun device failed to comport with Article I, sections 11 and 13, the Sixth Amendment, and the Due Process Clause of the Fourteenth Amendment. Specifically, defendant argues that, if seen by a jury, such a device might prejudice the jury against a defendant, thereby impairing his right to a fair trial; and that, even if the device is not seen, it might impede a defendant's ability to communicate with counsel and participate in his or her defense. Defendant notes that the latter concern is exacerbated in the case of a stun device as opposed to other forms of physical restraint, due to the possibility of its deliberate or accidental activation.

Defendant argues that the use of stun devices poses an issue of first impression for this court. He proposes that we adopt a detailed set of criteria that a trial court should be required to meet before it approves the use of a stun device, including holding a pretrial hearing if requested by the defendant and making findings on the record showing a "manifest need" for physical restraint of the defendant. According to defendant, factors relevant to the latter inquiry include the charges in the case; the defendant's criminal and escape history, if any; any "special risks" posed by the proceeding; the physical characteristics of the courtroom and courthouse; and the availability of other security devices or measures. Other criteria advocated by defendant include that the device not pose an unacceptable medical risk to the defendant; that it not be capable of inflicting pain or suffering that would constitute "unnecessary rigor" in contravention of Article I, section 13; that it not be visible to the jury; and that it not prevent the defendant from communicating with counsel.

Defendant argues that, in his case, the trial court erred as a procedural matter in failing to consider on the record any less restrictive alternatives to the stun device, failing to consider any possible medical risk to defendant of using it, and failing to consider whether the pain that the device was capable of causing would constitute unnecessary rigor. Defendant also asserts that, as a substantive matter, use of the device was not justified in his case because he had no history of escape attempts, because he planned to remain

seated at counsel table throughout the proceeding, and because there were other courthouse security mechanisms available. Finally, he asserts that the trial court's error was not harmless.

The state acknowledges that defendant had no history of escape attempts or misconduct while in custody, but contends that the nature of the current charges, defendant's "history of violence," his affiliation with a "dangerous street gang," his previous intimidation of witnesses, his custody classification as a "dangerous inmate," and his physical ability to overcome a deputy in the courtroom justified the use of restraints and that the stun device was the only available form of restraint that would not be visible to the jury. The state further contends that the risk of accidental discharge of the device was low and that defendant was fully informed of the actions that might prompt a discharge. It also contends that the trial court did, in fact, consider less restrictive alternatives and that, in any event, defendant declined to wear any device that would be visible, which included various less restrictive devices.

The state further asserts that any error was harmless because the stun device was not visible to jurors and because nothing in the record suggests that use of the device adversely affected defendant's defense. As to the latter point, the state notes that defendant did not testify at trial, that nothing in the record demonstrates that he would have testified in the absence of the device, and that nothing in the record demonstrates that use of the device interfered with his ability to interact with counsel. The state urges this court not to presume prejudice from the mere possibility of mental and psychological effects arising from the use of such a device, but to find error only when adverse effects are affirmatively and concretely demonstrated.

The use of restraints during a criminal trial is not an issue of first impression. As this court stated in *Bowen*, 340 Or at 495, "[t]his court long has recognized the right of a criminal defendant to appear free of physical restraints during a jury trial." *See also State v. Smith*, 11 Or 205, 207, 8 P 343 (1883) (citing with approval principles enunciated in *State v. Kring*, 1 Mo App 438 (1876), pertaining to the

common-law privilege to appear in court unfettered). That right is grounded in Article I, section 11, of the Oregon Constitution, which guarantees a defendant the right to a public trial by an impartial jury and the right to be heard "by himself [*sic*] and counsel," and in the Sixth Amendment to the United States Constitution, which provides in part that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defence [*sic*]." *See also* ORS 136.415 ("A defendant in a criminal action is presumed to be innocent until the contrary is proved."); *State v. Wall*, 252 Or App 435, 437-38, 287 P3d 1250 (2012), *rev den*, 353 Or 280 (2013) (physically restraining a defendant implicates Article I, section 11, and the Due Process Clause); *State v. Bates*, 203 Or App 245, 250, 125 P3d 42 (2005), *rev den*, 340 Or 483 (2006) (same). Specifically, the use of physical restraints can impinge on the presumption of innocence to which a defendant is entitled and may also impair a defendant's ability to participate in his or her defense, such as by consulting with counsel or by taking the stand as a witness. *See Bates*, 203 Or App at 251.

Nevertheless, a trial court has discretion to order physical restraint of a defendant if there is sufficient evidence of a substantial risk of dangerous or disruptive behavior, including the risk of assaultive conduct toward other persons and the risk of an attempted escape from custody. *See State v. Long*, 195 Or 81, 90-93, 244 P2d 1033 (1952) (citing with approval cases from other jurisdictions holding that trial courts had discretion to order that a defendant be restrained when evidence showed that the defendant might attempt to escape, that he might attack other persons, or that he was of dangerous character, as evidenced by his previously having killed a guard).

Such evidence should be placed on the record in a hearing for that purpose. After hearing relevant evidence from the state and the defendant, the trial court must make a record of its factual findings and reasoning in support of its order. *See generally McCarthy v. Oregon Freeze Dry, Inc.*, 327 Or 185, 188, 957 P2d 1200 (1998) ("the practical needs of meaningful appellate review underlie the court's obligation

to make explanatory findings" to support the exercise of discretion). We review a trial court's order requiring that a defendant be physically restrained for purposes of court-room security, including restraint by means of the electronic stun device at issue here, for abuse of discretion. *See State v. Farrar*, 309 Or 132, 156-58, 786 P2d 161, *cert den*, *Oregon v. Wagner*, 498 US 879 (1990) (trial court did not abuse discretion in ordering that defendant be restrained at trial by leg cuffs joined by a chain, because affidavits and a signed statement attested that defendant had threatened witnesses and had engaged in violent conduct toward other persons before his arrest).

Also pertinent to the inquiry is the extent to which a defendant establishes that the use of restraints interfered with his or her ability to participate with counsel in the defense of his case. *See Bowen*, 340 Or at 496 (declining to consider unpreserved claim of error relating to requirement that the defendant wear a stun belt during his trial, because "defendant failed to provide evidence or point to anything in the record indicating that the stun belt affected his ability to assist in his defense").

In this case, evidence concerning defendant's dangerousness and the risk of possible escape was placed on the record. And, based on that evidence, the trial court found that defendant had a history of violent person crimes; that the current charges involved a substantial sentence including the risk of a death penalty; that defendant had a history of gang affiliations; that he was alleged to have intimidated witnesses in this case; that his "size and physical capacities" might allow him to overpower other persons in the court-room; and that the victim in this case had been a witness in another case. The court also referred to the features of the courtroom and the courthouse that pertained to the security of the proceedings. The trial court found that the stun device would be operated by trained personnel, that it would not be visible, that it would not impede defendant's movements or his ability to consult with counsel, and that it was the "least visible, least intrusive" means of providing the necessary security. The court concluded that defendant posed an immediate and serious risk of escape and of disrupting the

proceedings and that use of the stun device therefore was appropriate. In addition to those findings, the trial court also made findings on each day of defendant's trial that the device was in fact not visible to the jury; defendant does not contend otherwise.

Evidence in the record supports each of those findings. Moreover, defendant failed to offer any evidence or point to anything in the record that suggests that, because of the stun device, he was impeded in his effort to assist in his defense. On this record, we cannot say that the trial court abused its discretion in requiring that defendant be restrained by use of a stun device.

C.  *Anonymous Jury (Assignment 7)*

In his seventh assignment of error, defendant argues that the trial court erred in empanelling an anonymous jury. The facts that are relevant to that assertion are as follows. Before the commencement of *voir dire* in defendant's trial, the trial court and counsel for defendant and the state discussed, by e-mail and in chambers, the question whether and to what extent juror names would be disclosed. In an e-mail to counsel for the parties, sent two days before trial began, the court stated, "Given the nature of this case[,] I do not want jurors' names to be used during *voir dire*, and do not want those names to be visible to the defendant or anyone else in the courtroom."

On the morning that jury selection began, the prosecutor and defense counsel further discussed the subject with the court in chambers. Following that discussion, defense counsel noted for the record that the parties had discussed in chambers and by e-mail "whether or not the attorneys would be allowed to use or refer to the jurors by the last name." Defense counsel explained that "[w]e would expect that the attorneys be allowed to." Counsel urged the court on the record to permit the use of prospective jurors' names in open court. Counsel noted that he was "aware that a number of these jurors have been on jury service," that they "have been referred to by name previously in jury selection," and that to deviate from what counsel characterized as standard practice would create "a sense of a need for anonymity" that would be prejudicial to defendant.

The prosecutor replied that "we are neutral on this subject," but wanted to note for the record "that the court has allowed the parties to have the names of the individual jurors, and I appreciate that very much," because, as defense counsel explained, having those names aids in "identification of the jurors and understanding who they are and the relationships, too, and we think that's very important."

The trial court ordered that jurors be referred to in court "by number only" and that the names not be made available to the public. The court further stated that it would explain to jurors that "this is done in every case." The trial court then provided such an explanation to each and every group of jurors questioned during *voir dire*. In a typical example of the explanation, the trial court explained to the first prospective juror that "[i]t's how we do it on all cases. It may seem kind of impersonal, but it's how we do it in all trials * * *."

On review, defendant argues that the trial court erred in empanelling an anonymous jury without finding, on the record, a sufficient basis for doing so. Defendant argues that the trial court's ruling violated the impartial jury guarantee of Article I, section 11, of the Oregon Constitution. He further argues that, for the same reasons that empanelling an anonymous jury violated his rights under the Oregon Constitution, it likewise violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The state advances three arguments in response. First, the state argues that the jury empanelled in this case was not an "anonymous" jury. The state acknowledges that, in a pretrial ruling by e-mail, the trial court ordered that defendant not be allowed access to the prospective jurors' names and that only counsel be given that information. Nevertheless, the state contends that, on the first day of jury *voir dire*, the prosecutor stated that the court had allowed "the parties" access to juror identities and nothing in the record suggests that defendant was not included. Second, the state argues that, in any event, defendant failed to preserve "[m]ost of the arguments" asserted in this assignment of error. In particular, the state contends that defendant failed

to ask the trial court to make findings supporting the use of juror numbers rather than names and failed to argue that use of an anonymous jury would violate his state or federal constitutional rights to an impartial jury or a public trial. Third, the state contends that the trial court's directive did not prejudice defendant, because the court explained to the jurors that referring to them by number in open court was the practice used in all cases and because the jurors understood that the parties had been provided with their names and other personal information.

This court has addressed the circumstances under which it may be permissible to empanel anonymous juries in two recent cases, *State v. Sundberg*, 349 Or 608, 247 P3d 1213 (2011), and *State v. Rogers*, 352 Or 510, 288 P3d 544 (2012). Because those decisions are dispositive, we consider each of them in some detail before addressing the arguments that the parties dispute in this case.

In *Sundberg*, the defendant had been charged with several sex crimes. Prospective jurors in the case were directed by the trial court not to disclose their names, their addresses, or the names of their employers during *voir dire*, and neither the defendant nor defense counsel was permitted access to the restricted information. The defendant objected to the court's procedure, arguing that failing to disclose juror identities compromised his ability to evaluate the prospective jurors. The trial court overruled the defendant's objections, explaining that it, and a number of other judges in that circuit, had adopted the practice in all cases in response to concerns about juror privacy. 349 Or at 610-12.

After the jury returned a guilty verdict, the defendant renewed his objections by means of a motion for a new trial. *Id*. at 612. The defendant noted that some of the jurors had participated in or watched *voir dire* in other courtrooms in which juror anonymity was not required. Those jurors, he argued, might have concluded that the anonymity in his case was required because the court thought him to be dangerous, thus violating his right to an impartial jury and the presumption of innocence. *Id*. at 612-13. The trial court denied that motion, and the Court of Appeals affirmed on other grounds.

On review before this court, the defendant argued that the trial court had erred in empanelling an anonymous jury without making findings justifying the procedure. The state's initial response was that the defendant had failed to preserve that contention, by neglecting to ask the trial court to make findings before *voir dire*. *Id.* at 614. On the merits, the state argued that legitimate concerns for juror privacy justify anonymity and, in any event, it was highly unlikely that jurors would draw an inference from the practice that the defendant was dangerous or guilty. *Id.* at 618.

This court began by rejecting the state's argument that the defendant had failed to preserve the issue. The court stated that the defendant plainly had preserved the "core claim" that empanelling an anonymous jury violated his rights to an impartial jury and the presumption of innocence. *Id.* at 614. The court acknowledged that the defendant had failed to request findings, but it concluded that, under the circumstances, that did not matter. The court noted, in particular, the fact that the trial court had stated categorically that it had decided, as a matter of general policy, to employ its procedure of empanelling anonymous juries and, implicitly, that findings were not needed to justify the procedure in any particular case. *Id.*

Turning to the merits, this court concluded that, although trial courts possess inherent authority to empanel anonymous juries in criminal cases, that authority is limited by a defendant's right to an impartial jury, guaranteed by Article I, section 11, of the state constitution. 349 Or at 617. The court further concluded that the use of anonymous juries can impair that constitutional right in either of two ways:

> "Empanelling an anonymous jury can affect a defendant's right to such an impartial jury, first, by hindering his ability to conduct *voir dire* and select jurors who are impartial, and second, because it is an external factor—not the facts or the law—that may compromise the jury's ability to remain impartial by implying that a defendant is dangerous, thus undermining the presumption of innocence. To be sure, anonymity may also imply a legitimate concern for juror privacy unrelated to the dangerousness of a defendant. But in a criminal case, there is a significant risk that

members of the jury might infer that their names were being withheld to protect them from defendant or others acting on his behalf."

*Id.* at 620 (citations omitted).

Because of that potential to impair a defendant's constitutional rights, the court concluded that anonymous juries are permissible on only two conditions. First, the trial court must make findings "that the circumstances of the particular trial provide sufficient grounds to believe that jurors need the protection provided by anonymity." *Id.* at 621. While it endorsed no particular factors that a trial court may consider, the court stated that courts have authority "to protect jurors from the risk of physical harm, intimidation, or harassment—whether by parties, the press, or the public—by withholding juror names and other identifying information." *Id.* at 622. The court emphasized, however, that the need for an anonymous jury "must be made on the facts of each case—and not on the basis of a generalized desire to protect the anonymity of jurors in all cases in the interest of juror privacy." *Id.*

Second, if the trial court makes appropriate findings that grounds exist to empanel an anonymous jury, then the court "must take reasonable precautions to ensure that the defendant's right to an impartial jury is protected." *Id.* Those precautions may include permitting extensive *voir dire* and providing a neutral explanation to the jury regarding the need for anonymity. *Id.* at 622-23.

The court in *Sundberg* concluded that the trial court had erred in failing to make any findings about the need for an anonymous jury. *Id.* at 624. The court further concluded that the error was not harmless. The court noted that "the use of an anonymous jury can cause prejudice to a defendant by suggesting to jurors that the defendant may be dangerous and, by extension, guilty." *Id.* at 624-25. That possibility, the court said, was heightened because some of the jurors had participated in other cases in which anonymous juries had not been used. *Id.* Particularly in a case in which the state's case largely turned on the credibility of the witnesses, the court concluded that "the unexplained use of an anonymous jury created too great a risk that the jury may have believed

that defendant was dangerous—and, therefore, that he was more likely to be guilty, denying defendant the right to a trial by an impartial jury." *Id*.

In *Rogers*, the defendant had been convicted of multiple counts of aggravated murder and sentenced to death; the convictions had been affirmed on appeal, but the sentence had been vacated and remanded for resentencing. *State v. Rogers*, 313 Or 356, 836 P2d 1308 (1992), *cert den*, 507 US 974 (1993). On remand, a jury was empanelled solely for the purpose of sentencing. The trial court gave prospective jurors the option of withholding certain identifying information requested on juror questionnaires. It also prohibited the use of juror names in open court and prohibited the defendant from having access to juror names and other identifying information. The court did provide the defendant's attorneys with prospective jurors' names and addresses and permitted them to question individual jurors about withheld information and informed at least some members of the jury of that fact. It also informed the jury that the described procedure was for the sole purpose of protecting their privacy from the public, consistent with an informal policy adopted by some of the judges in that particular circuit. 352 Or at 534-37.

On review, the defendant argued—relying on *Sundberg*—that the trial court had erred in overruling his objections to empanelling an anonymous jury. The state responded that the jury was not, in fact, "anonymous" within the meaning of *Sundberg*, because, although the defendant was not permitted to know the names of the jurors, his lawyers were. *Id*. at 537.

This court rejected the state's argument, explaining that

> "[j]urors may be 'anonymous' in different ways—from the defendant's perspective, because the defendant does not know their identifying information, from counsel's perspective, because counsel does not know their identifying information, and from their own perspective, because they understand that identifying information that they ordinarily would be required to provide may be withheld, and, in any event, will not be provided to the defendant."

*Id*. at 540. The court explained that, when a jury is anonymous from the perspective of the defendant, it may prevent the defendant from assisting in identifying jurors who may be biased against him or her. The court further explained that, when a jury is anonymous from the perspective of the jury itself—particularly when a jury is aware that anonymity is not the norm—that circumstance may suggest that their identities are being protected because the defendant is dangerous. *Id*. at 540-41. The court reasoned that the procedure that the trial court used "gave rise to the same risks that the court identified in *Sundberg*." *Id*. at 541. The court concluded that the principles relating to anonymous juries therefore were applicable. *Id*.

On the merits, this court concluded that the trial court erred in failing to make the required findings and had instead relied on a generalized policy that it apparently had applied to all cases. *Id*. at 542. The court further concluded that the error was not harmless, particularly in light of the fact that concerns about the inference of dangerousness that jurors may draw from their anonymity are "amplified" in the context of a capital penalty-phase proceeding, in which a defendant's future dangerousness is "specifically at issue." *Id*. at 544.

With this court's decisions in *Sundberg* and *Rogers* in mind, we turn to this case. We begin with the state's contention that the jury was not actually "anonymous." As we have noted, the state advances two arguments in support of that contention: First, because the record does not demonstrate that juror identities were not made available to both defendant and his lawyers, and second, because, in any event, the information was made available to his lawyers.

The first of the state's arguments is defeated by the pretrial ruling that, "Given the nature of this case[,] I do not want jurors' names to be used during *voir dire*, and do not want those names to be visible to the defendant." The state acknowledges that ruling, but it insists that the court might have changed its mind after further in-chambers discussions, as reflected by the prosecutor's later summary of

the court's decision to allow "the parties" to have the names of the individual jurors. As we have noted, however, defendant's lawyer summarized the same decision as allowing "the attorneys" to have access to juror identities. Moreover, nothing that the court said during the proceedings suggests that it had changed its mind about providing defendant access to the information.

As for the contention that jurors are not "anonymous" if their names are revealed to counsel, *Rogers* is dispositive. The state made precisely the same argument in that case, and this court rejected it. We do so likewise in this case.

We turn to the state's argument that defendant failed to preserve the contention that the trial court was required to make findings before empanelling an anonymous jury. Defendant concedes that he did not ask the court to make any particular findings before empanelling the jury. He argues, however, that neither did the defendant in *Sundberg*. According to defendant, just as the court in *Sundberg* found that the defendant in that case nevertheless adequately preserved the issue, so also should we conclude in this case, based on the fact that, in light of the court's statement that anonymous juries were required in all cases, a request for findings would have been superfluous.

We need not address that argument because, even assuming that defendant is correct that his failure to ask for findings may be excused, the trial court did not commit reversible error in empanelling an anonymous jury. As we have noted, both *Sundberg* and *Rogers* stated that, before empanelling an anonymous jury, a trial court must make findings that the particular circumstances of the case provide strong grounds for the practice. The requirement, however, does not exist for the mere sake of making findings. It exists for the purpose of ensuring that the trial court carefully considers the justifications for empanelling an anonymous jury in the context of the particular case. In this case, the record reflects that the trial court carefully took into consideration the particular circumstances of this case before deciding to empanel an anonymous jury.

The trial court explained that it believed that "the nature of this case" justified the practice. To be sure, the trial court did not spell out precisely what it meant by "the nature of the case." But it is not difficult to determine what the trial court meant.

In that regard, it is useful to note that the trial court's consideration of the parties' arguments about the use of an anonymous jury followed immediately on the heels of its consideration of their contentions concerning the use of a stun device. Indeed, the arguments are separated by a few lines on the same page of the transcript of pretrial proceedings. The trial court had just found, in some detail, that defendant was a convicted felon with a history of convictions for person crimes involving violence; that he had a history of connections with gangs; that he faced a substantial sentence that included a risk of the death penalty; that he already had been alleged to have intimidated witnesses in the case; that the courtroom was not secure; that there were many exits directly from the courtroom to the street; that defendant posed a significant risk of attempting to escape from the courtroom; and that, given his size and weight, defendant could readily overpower court security personnel or others in the courtroom.

In *Sundberg*, this court enumerated a "nonexclusive list" of factors that trial courts may consider in determining when it is appropriate to empanel an anonymous jury. Those factors include the defendant's involvement with organized crime, the defendant's participation in a group with potential to harm jurors, the defendant's past attempts to interfere with the judicial process or witnesses, and the risk of lengthy incarceration if the defendant is convicted. 349 Or at 621-22. In this case, the trial court's findings concerning the need to require defendant to wear a stun device addressed each of those factors.

Defendant did not object at trial that the trial court's findings were inadequate. Nor does he suggest on appeal that the findings do not meet the requirements of *Sundberg* and *Rogers*. Instead, as we understand it, defendant's argument is that the trial court erred in failing to repeat the same findings that it had just made with respect

to one aspect of courtroom security when addressing another. Although repeating the findings—or at least adopting them by reference—certainly may be preferable, we cannot say that it amounts to reversible legal error to fail to do so. Here, the trial court made the record that *Sundberg* and *Rogers* require a trial court to make.

There remains the question whether the trial court, having made the necessary findings to support withholding juror names from defendant, took reasonable precautions to ensure that defendant's right to an impartial jury was protected. In *Sundberg*, the court explained that the precise nature of those precautions "may differ depending on the circumstances at trial." 349 Or at 622. One precaution that the court mentioned, however, was a trial court's provision of "a neutral explanation[] for withholding juror identities." *Id*. at 623.

In this case, the trial court did just that. As we have noted, the trial court advised every group of jurors during *voir dire* to the effect that referring to jurors by number, and not by name, "is how we do it in all cases" and "it's how we do it in all trials." Such an explanation provided the jury with a plausible and nonprejudicial reason for not using their names and minimized the extent to which jurors might draw a negative inference from the practice. Under the circumstances, we conclude that the trial court did not err in empanelling an anonymous jury.

D. *Penalty Phase Security Measures (Assignments 8-10)*

In his eighth, ninth, and tenth assignments of error, defendant challenges the trial court's implementation of various additional security measures during the penalty phase of the trial without first informing the parties. Specifically, in his eighth assignment, defendant argues that the trial court erred in failing to inform him earlier that some jurors had expressed concerns to the judge's clerk about courtroom security. In his ninth assignment, defendant argues that the trial court erred in adopting additional security measures without informing the parties. And, in his tenth assignment, he argues that the trial court erred in denying his request to interview the jury regarding the effect, if any, of the security measures on its penalty-phase deliberations.

The trial court's errors, defendant argues, deprived him of the right to a fair trial and an impartial jury guaranteed by Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

The relevant facts are as follows. On the day that the jury notified the court that it had reached a verdict in the guilt phase of defendant's trial, "at least half of" the jurors expressed concern to the trial judge's judicial clerk, Hauck, about security in the courtroom as the verdict was read. Jurors expressed concern that spectators would be "audible" or "upset," that jurors would have to pass near "family members or people from the courtroom" while leaving the courtroom, and that they would be followed outside the courthouse; they asked for an escort to their vehicles. Hauck later described jurors' concerns as relating to "[r]eactions from people in the courtroom." One juror told Hauck that, during an earlier part of the trial, as she was leaving the courthouse, "she thought that someone from the gallery had said something to her in the hallway." Hauck testified that, when conveying their concerns, many of the jurors were "crying," "upset," "concerned," and "scared"; she also described them as "excited, emotional." Hauck immediately informed the trial judge of the jurors' concerns.

The jury then went to the courtroom to deliver its guilt-phase verdict. The trial judge cautioned persons in the courtroom to turn off all electronic devices and not to react in any way to the verdict. The subsequent pronouncement of the verdict was outwardly uneventful, and the trial court instructed the jury to report the following week for commencement of the penalty phase.

After jurors returned to the jury room, they expressed to Hauck further concerns about the court having instructed them in open court about the time and place they were to return the following week for the penalty phase. The jurors decided to meet at a parking area and walk to the courthouse together. Hauck informed the trial judge of those concerns as well. At the end of the day, the jurors left the courthouse by way of fire stairs and a van took them to their cars; neither of those methods had previously been used. At her

request, one juror was escorted across the street to meet a family member.

On Monday of the following week, the trial judge and courthouse security staff decided that jurors should meet on Tuesday at a public parking area, where a county van would pick them up and bring them to the courthouse. A member of the judge's staff telephoned the jurors and informed them of the arrangement, which continued throughout the penalty phase.

The next day, in its opening statement in the penalty phase, the state discussed defendant's gang affiliation and his history of violent conduct and informed the jury that its penalty-phase evidence would focus on the second applicable question: whether there was a probability that defendant "would commit criminal acts of violence that would constitute a continuing threat to society." ORS 163.150(1)(b)(B). According to Hauck, when the jurors returned to the jury room, they were "pretty upset," "shocked," had "the deer in the headlights look," and "seemed scared." That same day, they asked if their lunch would be provided and, when told it would not, "they started to coordinate amongst themselves to go to one location to eat and eat together." When advised later that day that lunch would be provided, they "seemed happy" that they would not have to leave the courthouse.

In the evidentiary portion of the penalty phase, the state offered the testimony of a number of witnesses, including law enforcement officials, a juvenile custody service worker, a parole and probation officer, corrections officials, and Stafford. Those witnesses testified about defendant 's long affiliation with the Six Deuce Crips gang, the nature of gang culture generally and the propensity of gang members to pose prison security problems, and defendant's record of gang-related criminal activity in particular, including his involvement with illegal drugs and weapons, violent crime, sex abuse, and "aggressive and hostile" behavior while in a correctional institution.

Defendant also called a number of witnesses, including family members and personal acquaintances, who testified that defendant is a caring son, a compassionate father to

his children, and a protective brother to his siblings. Defendant also called a forensic psychologist, who testified that, although defendant had a history of violence in the community, he had no record of reported incidents of violence, possessing a weapon, or acting on behalf of a gang during five years in various adult correctional institutions. The psychologist acknowledged, however, the possibility that defendant could influence other gang members to engage in violent acts outside the prison. Finally, defendant called a prison consultant, who testified that, although defendant had been sanctioned for being disobedient to institutional staff members, he believed that the Department of Corrections could "manage" defendant's conduct in an institution.

After the presentation of evidence in the penalty phase, and outside the presence of the jury, the trial court informed the parties that, from the beginning of the penalty-phase proceeding, it had implemented certain additional security measures. The following day, the court placed on the record the following summary of its disclosure:

> "Last evening after trial, I disclosed to the attorneys that certain security measures had been implemented around the courthouse for the security of the jury. I did not disclose this earlier, because of the need to preserve the integrity of that security. I did disclose it last night in order to give the defense an opportunity to make a record about any effects those security measures could possibly have on the jury's decision-making.
>
> "I want to make a record about the jury's request for security and what the Court did in response to the jury's request. I also want to make a record about what security threats were perceived by law enforcement personnel and what they did to address those threats."

The trial court then took evidence specifically relating to the implementation of the additional security measures, including testimony by the court's judicial clerk about the concerns expressed to her by the jury at the conclusion of the guilt phase, as described above. In addition, Sergeant Phillips—who, as previously noted, was responsible throughout the guilt and penalty phases for courtroom and courthouse security—testified that three persons identified as having past gang associations had attended parts

of defendant's trial and that, when that occurred, deputies made special efforts to keep track of those persons; he stated that deputies were particularly concerned about defendant's brother, who was scheduled to testify for the defense and whom Phillips described as a "very dangerous, violent" person. On one occasion, Phillips was informed by another deputy that one of the identified gang associates had made a comment to the victim's uncle. Another witness told Phillips that he was "scared to death." Phillips generally described the security surrounding defendant's trial as being raised "to a new height" due to concerns about defendant's own capabilities and also about "what his extended network of associates would be willing to do for him and with him." He testified that defendant's codefendant, Stafford, was afforded "special transportation" to and from the courthouse on the days that she testified.

Phillips testified that, after the jury rendered its guilt-phase verdict, he was notified by the judge's staff about the jury's safety concerns; he believed that the measures that were implemented at the beginning of the penalty phase were, "at the very minimum, appropriate." He also stated that, if further resources had been available, he would have provided a higher level of security. He testified that the capacity of the gallery was approximately 50 persons and that he was unable to distinguish which persons were associated with defendant and which with the victim; that, if special transport methods had not been instituted, there would have been an increased risk of contact between jurors and spectators; and that keeping the security measures secret was itself a component of the security plan. Phillips testified that he did not discuss the jurors' concerns with them and that officers involved in transporting jurors were instructed not to have any conversations with them; for example, when a juror asked another deputy about defendant's whereabouts, the deputy declined to respond.

The prosecutor also testified in regard to the perceived need for the penalty-phase security measures. He testified that, as he and the victim's uncle were leaving the courtroom after the jury gave its guilty verdict, he observed an associate of defendant make a threatening comment to

the victim's uncle; that two other witnesses expressed fears about their safety; and that telephone threats were made to another witness to the effect of, "You testify, and you're dead." The prosecutor testified that he informed the sheriff's department of those incidents and asked them to take them into account in formulating security measures for the penalty phase. The prosecutor believed that the security risks associated with defendant's trial were "the gravest that I have ever encountered."

Following presentation of the described testimony regarding the jury's penalty-phase security concerns, defendant moved for a mistrial or, in the alternative, for a directed verdict in the penalty phase of life in prison. Specifically, counsel argued that individual jurors' expressions of their fears tainted other jurors' views of the trial and that, the court, in responding to those concerns, effectively "validated" them. He argued that, although the court could have come to the conclusion that the additional security measures were appropriate, the defense should have been informed. Counsel argued that, "at least the parties would have had an opportunity to tailor a case differently, maybe address certain fears that even the jurors would have, through questioning." Counsel did not otherwise elaborate, however, on what he would have done differently had the court informed the parties of the jurors' concerns earlier—what additional witnesses might have been called, what different questions might have been asked, what different testimony might have been elicited, or what different arguments might have been advanced.

The state acknowledged that "it would have been better" if "both parties" had been aware of the security measures, but argued that the case had presented "unique" security concerns and that keeping the security plans secret was an appropriate part of the court's response to those concerns. The state argued that the trial court had inherent authority to impose the measures and that there was no evidence of any jury "taint."

The trial court denied defendant's mistrial motions. Defendant then moved to be allowed to question the jurors

with respect to the security measures. The trial court denied that motion as well.

The parties then proceeded to closing arguments. The state focused primarily on the second penalty-phase question: whether there was a probability that defendant would commit criminal acts of violence that would constitute a continuing threat to society. The state pointed in part to evidence that, even when he was incarcerated, defendant had a motive to carry out acts of violence against persons outside the prison, including "snitches," and that he had the means to do so through gang members who were "dedicated" to him as a "leader" and were willing to commit acts of violence at his direction. The state also noted defendant's record of recidivism, including convictions for violent crimes after serving sentences on previous convictions. Finally, it pointed to the nature of the particular murder in this case, murder of a witness.

Defense counsel's closing argument (both of defendant's attorneys gave closing arguments) addressed the subject of the jurors' fears of defendant. Counsel emphasized that the law required the jurors to act on the evidence and the law, not on their fears: "Are you afraid of [defendant]? Are you in fear of [defendant]? If you answer these questions based on emotion, he dies. That's not the law." Counsel told the jury that the state "tried to scare you. They tried to scare you by using the word 'gang' with virtually every witness." But the evidence, counsel explained, did not support the state's contentions. According to defendant's counsel, the evidence showed that defendant was a caring family man who, at age 37, posed no future risk of danger while serving a life sentence in prison.

Following the parties' closing arguments, the trial court offered to instruct the jury as follows:

> "Security Measures Not to Be Considered By the Jury. Various security measures are implemented in all court proceedings. Such measures should in no way be construed by you as any indication that the Court has formed an opinion about the matters you are to consider in your deliberations, and should have no weight or bearing whatsoever in your deliberations."

Defendant declined that instruction, and the state deferred to defendant's choice in that regard. As previously noted, the jury answered the three applicable penalty-phase questions in the affirmative, and the trial court sentenced him to death.

Again, in his eighth and ninth assignments of error, defendant asserts that the trial court erred in failing to disclose to him communications between the jury and the court and in failing to notify him of the additional security measures. At the outset, the precise nature of defendant's assignments is not clear to us. Ordinarily, an assignment of error is required to target a particular ruling of the trial court. *See* ORAP 5.45(3) ("Each assignment of error shall identify precisely the *** ruling that is being challenged."). In this case, defendant's eighth and ninth assignments do not address any particular rulings. As we understand it, however, the trial court's failure to disclose the jury's communications with the court and the implementation of additional security measures without notice provided the bases for defendant's motion for a mistrial. Consistently with that understanding, we note that defendant states in his brief that he preserved the eighth and ninth assignments of error by moving for a mistrial. Accordingly, we take defendant's eighth and ninth assignments of error to be directed at the trial court's denial of his mistrial motion.

We review the denial of a motion for a mistrial for abuse of discretion. *State v. Davis*, 345 Or 551, 582-83, 201 P3d 185 (2008). To the extent that the trial court's ruling was predicated on a conclusion of law, however, we review that aspect of the decision for errors of law. *See State v. Rogers*, 330 Or 282, 310, 4 P3d 1261 (2000) (when discretionary ruling is based on legal ruling, that component of the decision is reviewed for legal error).

In his eighth assignment, defendant argues that the trial court erred as a matter of law in failing to disclose to counsel and the parties its communications with the jury. According to defendant, Uniform Trial Court Rule (UTCR) 3.120 requires courts to disclose their communications with juries, and the trial court's failure to do so here was both improper and presumptively prejudicial.

The state responds that UTCR 3.120 is inapplicable here because it prohibits court employees from initiating contact with jurors whereas, in this case, jurors initiated the contact with court personnel regarding their security concerns, and neither court staff nor the trial judge responded to or communicated with the jurors directly regarding their expressed concerns. The state argues that, accordingly, no improper *ex parte* contacts occurred. Rather, the contacts were in the nature of "housekeeping" or "incidental" contacts, unrelated to the substance of the case; in those circumstances, reversal is not warranted absent harm to a defendant's substantive rights.

UTCR 3.120 provides that, subject to certain exceptions, "parties, witnesses or court employees must not initiate contact with any juror concerning any case which that juror was sworn to try." In this case, it is undisputed that no party, witness, nor court employee initiated any contact with any juror. In light of the fact that there was no violation of UTCR 3.120, we need not address defendant's contention that the violation was presumptively prejudicial.

In his ninth assignment, defendant contends that the trial court abused its discretion in implementing various additional security measures without first informing the parties. Defendant acknowledges that he is unaware of any case law holding that a trial court abuses its discretion in failing to inform the parties of additional security measures. Nevertheless, he argues that, because the adoption of additional security measures has the potential to influence the jury's assessment of a defendant's dangerousness, that potential, in turn, could cause the jury improperly to infer a greater likelihood of guilt. Accordingly, defendant argues, the trial court's decision—although concededly discretionary—should be subject to "close scrutiny."

The state contends that the trial court did not abuse its discretion in adopting the additional security measures or in failing to tell the parties, in advance, of its decision to do so. According to the state, the measures themselves were not "extraordinary" or of a type that is "inherently prejudicial," such as the use of shackles visible to a jury. Moreover, the state argues, the record supports the implementation of

the additional security measures. In that regard, the state observes that there is little likelihood that the jury drew any adverse inferences from the additional security as to defendant, given that what prompted the additional security was the jury's concern about others in the courtroom, not defendant. Finally, the state notes that defendant declined the trial court's offer to instruct the jury not to consider the measures.

Defendant's arguments concerning the trial court's decision to implement additional security measures without first informing the parties implicates two distinct trial court decisions. First, there is the court's decision to implement the additional security measures. Second, there is the court's failure to advise the parties of that decision in advance. Those two decisions implicate distinct concerns, and so we address them separately.

We begin with the court's decision to implement additional security measures. As we have noted, defendant argues that the additional security measures threatened his right to an impartial jury because such additional measures suggested that defendant was especially dangerous. Defendant acknowledges that the trial court's decision in that regard was a matter of discretion. Nevertheless, he argues that, under the circumstances of this case, the trial court abused that discretion.

Assuming for the sake of argument that the adoption of additional security measures suggests to the jury that it was defendant—as opposed to others in the courtroom—who was dangerous, defendant's argument appears to assume that all security measures are equally prejudicial. We are not persuaded that the assumption is justified.

Instructive in that regard is the United States Supreme Court's decision in *Holbrook v. Flynn*, 475 US 560, 106 S Ct 1340, 89 L Ed 2d 525 (1986). At issue in that case was whether a criminal defendant was denied his constitutional right to a fair trial when, at the defendant's trial with five codefendants, the trial court decided to supplement the ordinary courtroom security detail with four additional uniformed state troopers sitting in the first row of the spectators' section. The Court began its analysis by noting that

central to the right of a fair trial guaranteed by the Sixth and Fourteenth Amendments is the principle that a person accused of a crime "is entitled to have his [or her] guilt determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Id.* at 567 (citation omitted). "This does not mean," the court then qualified, "that every practice tending to single out the accused from everyone else in the courtroom must be struck down." *Id.* Only when a security measure is "inherently prejudicial" is "close scrutiny" required. *Id.* at 568. Even then, the court observed, such inherently prejudicial measures may be justified by the circumstances of the particular case. *Id.* But, in the absence of such inherently prejudicial security measures as visible shackles and gags, it is the defendant who bears the burden of proving that the security measures caused actual prejudice. *Id.* at 572.

In *State v. Cavan*, 337 Or 433, 98 P3d 381 (2004), this court addressed the right to an impartial jury under Article I, section 11, of the state constitution in similar fashion. At issue in that case was the constitutionality of conducting the defendant's criminal trial in the Snake River Correctional Institute. Specifically, the defendant argued that conducting his trial in prison violated his rights to an impartial jury under Article I, section 11, and his rights to due process under the Fourteenth Amendment.

The Court of Appeals held that the defendant did not state a cognizable claim under Article I, section 11. *State v. Cavan*, 185 Or App 367, 372-73, 59 P3d 553 (2002). As for the due process claim, the court, citing *Holbrook*, concluded that the defendant's federal constitutional rights were implicated, because conducting a trial in a prison was "inherently prejudicial." *Id.* at 373-75. Nevertheless, the court concluded that the trial court's security concerns justified the practice as a proper exercise of trial court discretion. *Id.* at 377.

This court reversed, concluding that conducting the defendant's trial in prison violated his rights under Article I, section 11. *Cavan*, 337 Or at 449. Although the court based its decision solely on the state constitution, it quoted extensively from the Court of Appeals' due process analysis under

*Holbrook* and expressly concluded that conducting a criminal trial in a prison is "inherently prejudicial." *Id.* at 447. That inherent prejudice is so great, the court ultimately concluded, that the Court of Appeals erred in concluding that the trial court's decision did not amount to an abuse of discretion. *See id.* at 449.

Following *Holbrook* and *Cavan*, then, the first issue is whether the security measures in question were "inherently prejudicial," a question of law. Defendant in this case does not argue that the additional security measures qualified as inherently prejudicial, and we are aware of nothing in the record to suggest that they did. Accordingly, the "close scrutiny" for which defendant contends does not apply. Rather, defendant bears the burden of establishing that the trial court abused its discretion in adopting the security measures that it did. In that regard, we note that the court did conduct an evidentiary hearing concerning the need for those additional security measures and gave defendant the opportunity to contest the adequacy of the record to support the trial court's decision. *Cf. United States v. Theriault*, 531 F2d 281, 285 (5th Cir), *cert den*, 429 US 898 (1976) ("Counsel, or the defendant himself in appropriate cases, should be given an opportunity both to respond to the reasons presented and to persuade the judge that such measures are unnecessary."). Moreover, the trial court offered to instruct the jury not to draw any adverse inferences from the additional security measures. But defendant declined the court's offer. And, on appeal, defendant does not contest the adequacy of the record to support the court's decision to implement the additional security measures. Under the circumstances, we find no abuse of discretion in the trial court's decision to implement those additional security measures.

We turn to the court's failure to inform the parties of its decision to implement those measures in advance. Defendant argues that he should have been given notice of the court's decision before it implemented additional security measures. In support, defendant cites federal circuit court decisions in which the courts held that courts should give criminal defendants the opportunity to contest the reasons for additional security. *See, e.g.*, *United States v. Brazel*,

102 F3d 1120, 1158 (11th Cir), *cert den*, 522 US 822 (1997) ("[When a] district court implements unusual visible security measures, it is required to state reasons for doing so on the record and give counsel an opportunity to respond." (Citing *Theriault*, 531 F2d 281)).

We need not address whether defendant is correct that the trial court erred in failing to give such advance notice, however. Even assuming that the trial court erred, defendant has failed to explain how he was harmed by that error. As we have noted, defendant argued to the trial court that, had the court provided advance notice, "at least the parties would have had an opportunity to tailor a case differently, maybe address certain fears that even the jurors would have, through questioning." Counsel, however, did not otherwise elaborate on what he would have done differently had the court informed the parties of the jurors' concerns earlier—what additional witnesses might have been called, what different questions might have been asked, what different testimony might have been elicited, or what different arguments might have been advanced. Indeed, as we have noted, on appeal, defendant has not contended that the trial court's decision to implement the additional security measures lacks support in the record. Under the circumstances, we cannot say that any error that the trial court committed in failing to provide notice of the additional security measures requires reversal.

That leaves defendant's tenth assignment, in which he contends that the trial court erred in denying him the opportunity to question the jurors about the possible effects of the security measures. The state argues that defendant's request to question jurors runs counter to the state's strong policy of protecting jury verdicts from attack. Moreover, the state contends, examining the jurors about their "thought processes" is an impermissible subject of inquiry. Defendant relies on a dissenting opinion in the Court of Appeals case, *Koennecke v. State of Oregon*, 122 Or App 100, 857 P2d 148, *rev den*, 318 Or 26 (1993), in arguing that he should have been given the opportunity to question jurors.

Once again, the trial court's decision is reviewed for an abuse of discretion. *See State v. Moore*, 324 Or 396,

425-26, 927 P2d 1073 (1996) (denial of motion for evidentiary hearing to determine whether there was juror misconduct reviewed for abuse of discretion). The state is correct that the courts of this state "strongly favor protecting jury verdicts from attack on the basis of statements made during jury deliberations." *Ertsgaard v. Beard*, 310 Or 486, 497, 800 P2d 759 (1990). Strictly speaking, this case does not involve a request to inquire into a jury verdict; defendant made his request to question jurors immediately before the jury began deliberations. Still, the general policy in favor of protecting the jury deliberation process counsels against questioning jurors, at least in the absence of some sort of showing that there is reason to believe that the process has been compromised. Even the dissent in *Koennecke* argued for permitting questioning of a jury in response to evidence of actual juror misconduct. 122 Or App at 106 (DeMuniz, J., dissenting). In this case, defendant asked for permission to question jurors about the mere *possibility* that one or more of them might have been in some way influenced by the presence of additional security in the court room. Under the circumstances, we find no abuse of discretion in the trial court's denial of that request.

E.  *Jury Instruction on Mercy (Assignment 11)*

        In his eleventh assignment of error, defendant argues that the trial court erred in declining to instruct the jury in the penalty phase of his trial that each juror

> "has the individual authority to extend [to defendant] mercy for any reason whatsoever.
>
> "The law recognizes and authorizes that any individual juror may base a decision to impose a sentence less than death on mercy alone."

Defendant argues that the trial court's instructions to the jury effectively informed them that their decision whether to sentence defendant to death must be based only on evidence presented, whereas, according to defendant, the law—including decisions of the United States Supreme Court and various state appellate courts, Oregon's own "open-ended" capital sentencing scheme, and, in light of the purported role of mercy in human culture, the Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution—permits the application of mercy without reference to such evidence. Defendant further argues that mercy is a form of moral reasoning and thus is distinct from sympathy or forgiveness, which he acknowledges to be improper bases for a verdict. Defendant argues that, because no other instruction given by the trial court incorporated the identified principles, the trial court erred in failing to so instruct the jury.

The state first responds that defendant failed to raise below most of his arguments in support of the giving of an instruction on mercy, including his constitutional arguments, and that those arguments therefore are not preserved. The state also argues that defendant's proposed instruction was not a correct statement of the law. According to the state, mercy—like sympathy—is a form of emotion and thus has no place in jury deliberations in either a guilt-phase or a penalty-phase proceeding. The state also argues that, to the extent that defendant's requested instruction correctly stated the law, it was redundant to other instructions given by the trial court, which, the state asserts, correctly and fully advised the jury of its role in determining defendant's sentence.

A party is generally entitled to a jury instruction based on its theory of the case if the instruction is warranted by the particular facts and correctly states the law. *State v. McBride*, 287 Or 315, 319, 599 P2d 449 (1979). The trial court does not err, however, in declining to deliver an instruction that is not legally correct. *Williams v. Philip Morris Inc.*, 344 Or 45, 56, 176 P3d 1255 (2008), *cert dismissed as improvidently allowed*, 556 US 178 (2009).

Our analysis of the parties' arguments in this case is controlled by two prior cases. First, in *State v. Moen*, 309 Or 45, 786 P2d 111 (1990), the trial court instructed the jury not to consider sympathy in determining whether to impose the death penalty. On appeal, the defendant argued that the trial court erred, arguing that the court should have instructed the jury that it was entitled to take sympathy into account in rendering its judgment. This court rejected the argument, explaining that "general sympathy, or any emotionalism, has no place in a capital sentencing decision,

just as it has no place in the jury's deliberations during the guilt phase." *Id.* at 92. The role of the jury, the court explained, is "to reach a *reasoned* decision based solely on the evidence before them." *Id.* at 93 (emphasis in original).

Second, in *State v. Moore*, 324 Or 396, 927 P2d 1073 (1996), this court addressed the propriety of delivering two different jury instructions that pertained to the subjects of sympathy and mercy. The first instruction informed the jury that "a decision that death is not appropriate may be made on the basis of sympathy for the [d]efendant *if that sympathy is based on mitigating evidence.*" *Id.* at 427 (emphasis in original). The court held that the instruction was proper, because it informed the jury that its decision was required to be based on mitigating evidence. *Id.*

The second instruction was one that the trial court declined to deliver. That instruction would have informed the jury that it "may be influenced by feelings of sympathy or mercy toward defendant, even if those feelings were *not* based upon any mitigating evidence." *Id.* (emphasis in original). The court held that the trial court did not err in failing to deliver that instruction. Citing *Moen*, the court reiterated that considerations of sympathy have no place in jury's penalty determination in a capital case. 324 Or at 428. Rather, the court explained, "any instruction that appeals to the jurors' sympathies also must instruct the jurors that such sympathy must be based upon the mitigating evidence before them." *Id.*

Defendant argues that *Moen* and *Moore* are distinguishable because they involve instructions regarding sympathy, not mercy, which defendant insists is different. We need not address whether, in the abstract, there is a meaningful distinction between an instruction involving "sympathy" and one involving "mercy." That is because, in asserting a distinction between the two, defendant has missed the significance of this court's prior decisions. Both *Moen* and *Moore* turned not on the fact that the requested instructions involved appeals to sympathy, but on the fact that those requested instructions failed to inform the jury that their decisions must be based on the evidence before them. *Moore*, 324 Or at 428; *Moen*, 309 Or at 93.

In this case, defendant's requested instruction would have instructed the jury that it could base its decision on mercy "alone" and "for any reason whatsoever," without respect to the evidence. That instruction cannot be reconciled with *Moore* and *Moen*.

The result is the same under the federal constitution. Controlling in that regard is *California v. Brown*, 479 US 538, 107 S Ct 837, 93 L Ed 2d 934 (1987). In that case, the Court addressed whether an instruction that jurors must not be swayed by "mere *** sympathy" in the penalty phase of a capital case violated the defendant's rights under the Eighth and Fourteenth Amendments. Holding that it did not, the Court emphasized that the key was not the meaning of the word "sympathy," but the fact that the instruction properly cautioned the jury to base its decision only on the evidence before it. *Id.* at 541. In the Court's view, the instruction properly "limit[ed] the jury's sentencing considerations to record evidence" and, in so doing, "ensure[d] the availability of meaningful judicial review" of the jury's decision. *Id.* at 543.

We conclude that the trial court did not err in failing to deliver defendant's requested instruction.

F. *Victim Impact Evidence (Assignments 13-14)*

In his thirteenth assignment of error, defendant argues that the trial court erred by admitting, during the guilt phase of his trial, victim impact evidence in the form of testimony by a witness—the victim's uncle. In his fourteenth assignment of error, defendant argues that the trial court erred in denying his motion for a mistrial based on the admission of that evidence. Defendant acknowledges that ORS 163.150(1)(a) provides for admission of such evidence during the penalty phase following a defendant's conviction of aggravated murder and that, moreover, the United States Supreme Court has held that the introduction of such evidence during the penalty phase of a capital murder trial does not infringe on a defendant's constitutional rights. He argues, however, that, in the guilt phase of a trial, such evidence is irrelevant under Oregon Evidence Code (OEC) 401 and is unduly prejudicial under OEC 403. He further argues

that the trial court's error in admitting the evidence in the guilt phase of his trial was not harmless; he notes that, at the conclusion of the challenged testimony, at least one juror was crying and other jurors were "visibly shaken," and the state may have rekindled those emotions by referring to the testimony in its guilt-phase closing argument.

The state first responds that, at trial, defendant insufficiently identified the specific portions of the victim's uncle's testimony that he asserted to be inadmissible victim impact evidence and that he therefore cannot now challenge the admission of those portions. We disagree. The record shows that, in addition to requesting and obtaining a continuing objection, defendant objected to particular portions of the witness's testimony.

The state also asserts that the challenged evidence was not victim impact evidence but was mere "victim background" or "family background" evidence that provided context to the jury and that in effect "humanized" the proceeding, and that the evidence therefore both met the "very low" standard for relevance under OEC 401 and was not unduly prejudicial under OEC 403. The state further asserts that, to the extent that defendant is challenging the uncle's testimony as a whole by challenging the trial court's denial of his motion for a mistrial, the trial court did not abuse its discretion in denying that motion. Finally, the state argues that, in any event, admission of the evidence was harmless because the state provided similar information in its opening statement, because other witnesses also testified without objection about the victim, and because the trial court instructed the jury not to base its guilt-phase verdict on sympathy for any of the parties involved.

The testimony of the witness—again, the victim's uncle—included information about the witness's relationship to the victim; about the victim's home country, Sierra Leone, and his extended family there; and about the circumstances of the victim's immigration to the United States, his residency status in this country, and his residential, educational, and employment history in Oregon. The witness also testified about the frequency and nature of interactions

between himself and the victim in the time leading up to the murder, such as the witness's brief statement that the victim came to his house and helped him with chores. The witness testified that, to his knowledge, the victim did not own any firearms. He testified that he had met two of the victim's women friends but had not met Stafford. He also testified that, after July 4, 2004—the date on which someone broke into Stafford's apartment—the victim was "scared, really scared."

The witness also described the circumstances surrounding his learning of the victim's death. At various points during his testimony, the witness also testified about himself, including his age, when he came to the United States, and his educational and employment background. At several points during his testimony, he was prevented by the prosecutor or by the trial court's rulings on defense counsel's objections from giving details about the political situation in Sierra Leone, from making more than a single passing reference to the victim's personality and his liking for music and soccer, and from describing the content of any conversation the witness had with the victim around July 2004 regarding "any concerns or fears" the victim may have had.

ORS 163.150(1)(a) sets out requirements for the conduct of a "separate sentencing proceeding" following a defendant's conviction for aggravated murder and provides in part that, in the proceeding,

> "evidence may be presented as to any matter that the court deems relevant to sentence *including, but not limited to, victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family and any aggravating or mitigating evidence relevant to the issue in paragraph (b)(D) of this subsection*; however, neither the state nor the defendant shall be allowed to introduce repetitive evidence that has previously been offered and received during the trial on the issue of guilt."

(Emphasis added.) The emphasized portion of ORS 163.150(1)(a) was added to the statute by the 1995 legislature. Or Laws 1995, ch 531, § 2; Or Laws 1995, ch 657, § 23. This court has not previously considered precisely what types of evidence constitute victim impact evidence, that is,

evidence regarding "personal characteristics of the victim or impact of the crime on the victim's family."

We need not do so here, however, because, even assuming that any portion of the witness's testimony falls within that category of evidence; even assuming that admission of the evidence in the guilt phase of defendant's trial therefore was erroneous; and even assuming that the trial court abused its discretion in denying defendant's motion for mistrial, any error was harmless. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (reviewing court will affirm verdict despite error if there is little likelihood that the error affected the verdict). Of approximately 2000 pages of guilt-phase trial transcript, the witness's actual testimony occupied approximately 23 pages. And, in that testimony, references to anything that arguably may have met the definition of victim impact evidence were minimal, including the witness's single brief statement that the victim was "a nice person, he's gentle, he loves music, he loves soccer" and the fact that, after the witness learned of the victim's death, "[i]t's never been the same." *Cf. State v. Johns*, 301 Or 535, 559, 725 P2d 312 (1986) (in trial encompassing testimony of 60 witnesses and 1700 pages of transcript, Supreme Court deferred to trial court's exercise of discretion under OEC 403 as to whether particular item of evidence was unduly prejudicial). Moreover, similar testimony by other witnesses was admitted without objection, including testimony by the victim's friend, Carter, that, when the victim's family learned of the victim's death, they "emotionally fell apart." In short, it is unlikely that admission of the challenged testimony, even if erroneous, affected the jury's guilt-phase verdict. Defendant's thirteenth and fourteenth assignments of error do not afford him the requested relief.

G. *Prosecutor's Penalty-Phase Opening Statement (Assignment 15)*

In his fifteenth assignment of error, defendant argues that the trial court erred in denying his motion for a mistrial based on the prosecutor's statement to the jury that, when Stafford had "other boyfriends over time, [defendant] was so extremely possessive *** to the point that he would kill them. This is the mind we're dealing with." The

prosecutor made that statement at the opening of the penalty phase of defendant's trial. Defendant immediately moved for a mistrial, noting that the prosecutor had referred to "boyfriends" in the plural and had stated that defendant "would kill them," and arguing that there was "no evidence of that." The trial court denied the motion.

On review, defendant argues that the prosecutor's comments were improper and sufficiently prejudicial so as to create a bias against him in the minds of the jury and therefore to deny him a fair trial, in violation of his rights under the Due Process Clause of the Fourteenth Amendment. Specifically, he argues that the comments gave rise to an implication of ongoing dangerousness that was relevant to the jury's consideration of whether to sentence him to death—specifically, its consideration, under ORS 163.150(1)(b)(B), of "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]" Nor, he argues, were the comments mitigated by any curative instruction. He asks this court to vacate his death sentence and remand for a new penalty phase.

The state responds that, for several reasons, the trial court did not abuse its discretion in denying defendant's motion for a mistrial. The state argues that it was "obvious" that the prosecutor was using the pronoun "them" colloquially to refer to a single person, the victim, and that, to the extent that the reference was ambiguous, none of the prosecutor's other statements suggested that defendant had killed anyone other than the victim. The state also notes that defendant did not ask for a curative instruction and that, conversely, the jury was instructed to base its penalty-phase verdict "only on the evidence" and that "[t]he lawyer's statements and arguments are not evidence."

We review a trial court's denial of a motion for a mistrial for abuse of discretion. *State v. Davis*, 345 Or 551, 582-83, 201 P3d 185 (2008), *cert den*, 558 US 873 (2009). A trial court is in the best position to assess the prejudicial effect, if any, of a prosecutor's statements to the jury. *State v. Barone*, 328 Or 68, 83, 969 P2d 1013 (1998), *cert den*, 528 US 1135 (2000). We will not find an abuse of discretion in the

trial court's denial of a defendant's motion for mistrial on that basis unless the effect of the prosecutor's comment was to deny defendant a fair trial or penalty-phase proceeding. *State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990). Generally, a proper jury instruction is adequate to cure any presumed prejudice from a prosecutor's improper statement. *Davis*, 345 Or at 583. "Ultimately, we must decide whether, under the circumstances as a whole, [the] defendant was denied the right to a fair trial, as a matter of law, by the events that transpired at trial." *Id.* (citing *State v. Compton*, 333 Or 274, 293, 39 P3d 833 (2002), *cert den*, 537 US 841, *reh'g den*, 537 US 1068 (2002)).

In this case, the prosecutor's statement to the jury at the beginning of the penalty phase amounts to 26 pages of the penalty-phase trial transcript, which also includes approximately one thousand pages of witness testimony. In addition to the challenged remark, the prosecutor informed the jury that defendant was a "leader" of the Portland "set" of the Crips gang; that he "engaged in daily illicit gang activities"; that he derived his income from the illegal distribution of crack cocaine; that he possessed and used crack cocaine and marijuana, and possessed and used illegal weapons; that he exposed his children to criminal activity; that, at age 15, he assaulted a store clerk; that, at age 16, he participated in the gang rape of a 13-year-old girl; that, while awaiting trial on that rape charge, he assaulted two guards in a Portland detention facility; that he twice escaped from a youth correctional facility; that he engaged in domestic violence against women, including beating and strangling them, in some instances in violation of restraining orders; that some of his domestic violence conduct took place in the presence of children; that he pistol-whipped his daughter's boyfriend; that he violated his adult probation; and that he previously had been charged with assaulting the victim in the present case. Thus, the prosecutor's opening summary to the jury included multiple references to violent or otherwise unlawful conduct by defendant, thereby vitiating the effect of the challenged statement.

Again, at the conclusion of the penalty phase, the trial court instructed the jury that it was to base its answers to the penalty-phase questions "only on the evidence and

these instructions" and that "[t]he lawyer's statements and arguments are not evidence." *See Smith*, 310 Or at 26 (absent an overwhelming probability that they would have been unable to do so, jurors are presumed to have followed their instructions).

In light of the prosecutor's entire opening presentation to the jury in the penalty phase, as well as the witness testimony and the trial court's instructions to the jury in that phase, we cannot say that the trial court abused its discretion in denying defendant's motion for a penalty-phase mistrial based on the challenged statement. We reject defendant's fifteenth assignment of error.

## H.  *Lethal Injection Protocol (Assignment 16)*

In his sixteenth assignment of error, defendant contends that the trial court erred in imposing the death penalty over his objection, under the Eighth Amendment to the United States Constitution, to Oregon's method of execution. According to defendant, the statutes and rules governing Oregon's three-drug lethal injection protocol do not adequately ensure that persons administering the drugs have sufficient qualifications and training to properly do so and do not adequately provide for "backup" drugs and equipment if the initial administration of drugs is unsuccessful, either by failing to cause death or by causing the person to experience such effects as severe pain or suffocation, in violation of the constitutional prohibition on cruel and unusual punishment.

The state responds that defendant's challenge to the method of his execution is premature because, in capital cases, exhaustion of a defendant's appeals and other state and federal post-conviction remedies typically takes many years and, by the time defendant has completed or waived his right to those procedures, Oregon's execution protocol may have been revised; moreover, whether or not that is the case, defendant will have the opportunity at that time to challenge it. On the merits, the state notes that Oregon's three-drug lethal injection protocol is similar to the one approved by the United States Supreme Court in *Baze v. Rees*, 553 US 35, 128 S Ct 1520, 170 L Ed 2d 420 (2008). In that case, the Court held that any risks of improper

preparation or administration of the first of the three drugs, the anesthetic sodium thiopental—including calculation and preparation of an adequate dose of the solution, proper insertion of intravenous lines for its injection, and adequate monitoring of the drug's effects—were not "so substantial or imminent as to amount to an Eighth Amendment violation." *Id.* at 54-62.

We agree with the state that the specific method of defendant's execution—as opposed to the death sentence itself—is not ripe for consideration by this court, nor will it be until all direct and collateral review proceedings have concluded and a death warrant has issued under ORS 137.463. *See* ORS 138.686 (providing for stay of execution of death sentence during pursuit of state and federal direct and collateral review of the defendant's conviction and sentence). We therefore reject defendant's sixteenth assignment of error without further discussion.

I.  *Facial Unconstitutionality of ORS 163.150(1)(b)(D) (Assignment 18)*

In his eighteenth assignment of error, defendant argues that the trial court erred in denying his demurrer to Counts 1 and 2 of the indictment, the aggravated murder counts. The demurrer sought to challenge the facial constitutionality of Oregon's capital-sentencing scheme—specifically, ORS 163.150(1)(b)(D) (the so-called "fourth question"), as modified by ORS 163.150(1)(a) and by the jury instruction required under ORS 163.150(1)(c)(B). According to defendant, as so modified, ORS 163.150(1)(b)(D) is unconstitutional on its face under the Eighth and Fourteenth Amendments because it permits the admission of "any" aggravating evidence, including evidence that is outside the kinds of victim impact evidence approved by the United States Supreme Court in *Payne v. Tennessee*, 501 US 808, 111 S Ct 2597, 115 L Ed 2d 720 (1991), and that is not relevant to any corresponding factual issue on which the state has the burden of proof; and because it permits the penalty-phase jury to disregard or fail to give full effect to mitigating evidence. Defendant also argues that ORS 163.150(1)(b)(D) is facially unconstitutional because it permits the imposition of a death penalty without the jury having found the relevant

facts beyond a reasonable doubt or unanimously. Finally, he argues that it is facially unconstitutional because its open-ended nature precludes meaningful appellate review.

The state responds that, in the first instance, it did not present any victim-impact evidence in this case that was not otherwise admissible and that defendant fails to identify any aggravating evidence that did not relate to the penalty-phase questions. The state also asserts that, in any event, this court previously has rejected facial challenges to ORS 163.150 on those grounds. As to defendant's other challenges to ORS 163.150(1)(b)(D), the state notes that the penalty-phase jury must find unanimously and beyond a reasonable doubt the facts supporting an affirmative response to each of the first three penalty-phase questions, ORS 163.150(1)(b)(A)-(C), and that additional facts, if any, that the jury relies on in answering the question stated in ORS 163.150(1)(b)(D) are, by comparison, "mere evidence" that the jury is not required to find at all, and therefore need not find unanimously or beyond a reasonable doubt. The state also argues that, in any event, ORS 163.150(1)(b)(D) is not facially unconstitutional because it is capable of con-stitutional application. Finally, the state notes that this court repeatedly has rejected demurrers to Oregon's capital sentencing scheme based on the purported unavailability of meaningful appellate review.

ORS 163.150(1)(b)(D) provides that the trial court submit to the penalty-phase jury the question "[w]hether the defendant should receive a death sentence." ORS 163.150(1)(a) provides in part for the admission, in the sentencing pro-ceeding, of evidence

"as to any matter that the court deems relevant to sen-tence *including, but not limited to, victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family and any aggravat-ing and mitigating evidence relevant to the issue in [ORS 163.150(1)(b)(D)]*[.]"

(Emphasis added.) ORS 163.150(1)(c)(B) provides:

"The court shall instruct the jury to answer the *ques-tion in [ORS 163.150(1)(b)(D)] 'no' if, after considering any aggravating and any mitigating evidence concerning* any

> aspect of the defendant's character or background, or any
> circumstances of the offense *and any victim impact evi-*
> *dence as described in [paragraph (a) of this subsection], one*
> *or more of the jurors believe that the defendant should not*
> *receive a death sentence.*"

(Emphasis added.) The emphasized portion of ORS
163.150(1)(a) was added to the statute by the 1995 legis-
lature. Or Laws 1995, ch 531, § 2; Or Laws 1995, ch 657,
§ 23. The emphasized portions of ORS 163.150(1)(c)(B) were
enacted by the 1997 legislature. Or Laws 1997, ch 784, § 1.

      We previously have determined that ORS 163.150 is
not facially unconstitutional by reason of the fact that ORS
163.150(1)(b)(D) does not expressly require jury unanimity
or proof beyond a reasonable doubt. *See State v. Brumwell*,
350 Or 93, 111-12, 249 P3d 965 (2011), *cert den*, 132 S Ct
1028 (2012) (even assuming that the Sixth Amendment
requires jury unanimity on penalty-phase aggravating evi-
dence under ORS 163.150(1)(b)(D) as qualified by ORS
163.150(1)(c)(B), the latter is capable of constitutional appli-
cation because it does not preclude the trial court from also
instructing the jury in that regard to the extent that such
an instruction is constitutionally required; accordingly, the
statute is not facially unconstitutional); *State v. Fanus*, 336
Or 63, 70-74, 79 P3d 847 (2003), *cert den*, 541 US 1075 (2004)
(ORS 163.150(1)(b)(D) frames a discretionary inquiry for
the jury and is not subject to any burden of proof). As to
whether ORS 163.150(1)(b)(D) precludes meaningful appel-
late review, we rejected that argument in *Moore*. 324 Or at
429-34 (where ORS 163.150(1)(b)(D) frames a discretionary
determination for the jury that is not subject to a burden
of proof but that nevertheless must be based on evidence
presented at trial, the reviewing court has the function of
reviewing the jury's decision to determine whether, in view
of the evidence, a rational juror could have concluded that
the defendant should be sentenced to death).

      We turn to defendant's assertions that ORS
163.150(1)(b)(D) renders Oregon's death penalty scheme
facially unconstitutional by reason of permitting the admis-
sion of overly broad classes of aggravating and victim impact

evidence. This court has not expressly considered those arguments since the enactments of the above-quoted 1995 and 1997 amendments to ORS 163.150(1)(a) and ORS 163.150(1)(c). Again, defendant contends that ORS 163.150(1)(b)(D) and its related statutes are facially unconstitutional because they permit the admission of "any" aggravating evidence, including evidence that is outside the kinds of victim impact evidence approved by the United States Supreme Court in *Payne* and that is not relevant to any corresponding factual issue on which the state has the burden of proof; and because they permit the penalty-phase jury to disregard or fail to give full effect to mitigating evidence in violation of the Eighth and Fourteenth Amendments.

We disagree. As to aggravating evidence, again, ORS 163.150(1)(a) provides in part that, in the penalty-phase proceeding,

> "evidence may be presented as to any matter that the court deems *relevant to sentencing*, including, but not limited to, victim impact *evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family* and any aggravating or mitigating evidence *relevant to the issue in* [ORS 163.150(1(b)(D)]."

(Emphasis added.) Consistently with the emphasized portions of that provision, and notwithstanding the legislature's use of the adjective "any," aggravating evidence presented to the penalty-phase jury must be "relevant to sentencing." And, notwithstanding the fact that admissible evidence is "not limited to" the expressly stated types of evidence, the provision nevertheless is capable of being applied in a manner that is consistent with the strictures of the United States Supreme Court as set out in *Payne*. *See*, 501 US at 825 (although the Eighth Amendment does not prohibit admission of victim impact evidence, the Due Process Clause protects against admission of victim impact evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair"). Defendant's facial constitutional challenge to ORS 163.150(1)(b)(D) based on the admission of aggravating evidence is not well taken.

Similarly, we reject defendant's argument that ORS 163.150(1)(b)(D) is facially unconstitutional in regard to the

admission, and the jury's consideration, of mitigating evidence, by permitting the jury to disregard such evidence altogether or, at a minimum, by failing to guide its discretion or to provide it with a "vehicle" for giving such evidence its "full effect." Again, ORS 163.150(1)(c)(A) provides:

> "The court *shall instruct the jury to consider*, in determining the issues in [ORS 163.150(1)(b)], *any* mitigating circumstances offered in evidence, *including but not limited to the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed.*"

(Emphases added.) Also, as previously described, ORS 163.150(1)(c)(B) in part directs the trial court to instruct the jury that, in answering the question set out in ORS 163.150(1)(b)(D), it

> "consider[] any aggravating evidence and *any* mitigating evidence concerning any aspect of the defendant's *character or background* * * *."

(Emphases added.) Thus, both of the quoted provisions expressly require the trial court to instruct the jury to "consider" mitigating evidence, and the required instructions provide at least some guidance to the jury regarding the nature of the mitigating evidence that it is to consider—in the former case, by listing various specific types of mitigating evidence that the jury may consider and the latter by generally characterizing such evidence as relating to a defendant's "character or background." Presuming, as we must, that a jury follows a trial court's instructions, those features have the effect of both directing the jury to consider mitigating evidence and guiding it in doing so. Accordingly, ORS 163.150 is not facially unconstitutional by reason of permitting a jury to ignore or improperly consider mitigating evidence.

For all of the above reasons, we reject defendant's eighteenth assignment of error.

J.   *Remaining Assignments of Error*

Defendant's remaining assignments of error we reject without discussion.

## CONCLUSION

The judgment of conviction and sentence of death are affirmed.