No. 401 June 12, 2024 235

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

MIKE SPENCER WASHINGTON, JR.,
*Petitioner-Appellant,*

*v.*

Brandon KELLY,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
15CV10000; A165796

Linda Louise Bergman, Judge.

Argued and submitted March 27, 2019.

Andy Simrin argued the cause for appellant. Also on the brief were W. Keith Goody and Andy Simrin PC.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General and Timothy A. Sylwester, Assistant Attorney General.

Before Ortega, Presiding Judge, Lagesen, Chief Judge, and Powers, Judge.*

POWERS, J.

Affirmed.

_____
\* Lagesen, C. J., *vice* Linder, S. J.

**POWERS, J.**

In this post-conviction proceeding, petitioner appeals from a judgment denying him post-conviction relief, raising four assignments of error. In 2004, Mohamed Jabbie testified against petitioner before a grand jury. Soon afterwards, petitioner shot and killed Jabbie. In 2010, a jury found petitioner guilty of aggravated murder, and petitioner was sentenced to death. On automatic and direct review, the Oregon Supreme Court affirmed both petitioner's conviction and sentence. *State v. Washington*, 355 Or 612, 330 P3d 596, *cert den*, 574 US 1016 (2014). Petitioner then sought post-conviction relief asserting, among other arguments, that trial counsel was inadequate for failing to investigate and present evidence that an identifiable person other than petitioner murdered Jabbie. The post-conviction court denied relief. On appeal, in his first assignment of error, petitioner argues that he received inadequate assistance of counsel because trial counsel failed to adequately investigate whether another person killed Jabbie. We are not persuaded that the post-conviction court erred in rejecting petitioner's claim that trial counsel failed to exercise reasonable professional skill and judgment or that he suffered prejudice as a result of trial counsel's performance. In addition, we reject petitioner's second, third, and fourth assignments of error challenging the post-conviction court's rulings. Accordingly, we affirm.

## I.  FACTUAL BACKGROUND

We review the post-conviction court's determinations for legal error, and we accept the court's implicit and explicit factual findings if there is evidence in the record to support them. *Green v. Franke*, 357 Or 301, 312, 350 P3d 188 (2015).

We begin by summarizing some of the underlying facts as described in *Washington*, 355 Or at 614-17, to assist in understanding petitioner's post-conviction arguments. During the 1990s, petitioner and Shirleen Stafford had two children together, but they lived apart and dated other people. Around 2004, Stafford met Jabbie, and the two began seeing each other. In July 2004, while Jabbie was at Stafford's apartment, petitioner broke into the apartment

and assaulted Jabbie. Stafford told petitioner that he should pay for the damage that he caused in her apartment or else he was going to jail. Petitioner remarked that he was not going to jail "without a witness." Stafford understood petitioner's remark as a threat, and she warned Jabbie that his life was in danger.

A grand jury subpoenaed Stafford and Jabbie to testify about the July incident at Stafford's apartment. Petitioner attempted to convince Stafford to lie to the grand jury, and he threatened to kill her. Stafford and Jabbie testified before the grand jury in September 2004. After Stafford appeared before the grand jury, petitioner told Stafford to meet him at Clackamas Town Center, which was close to Jabbie's apartment.

At that location, petitioner gave Stafford one of his two cell phones. He told Stafford to go to Jabbie's apartment and to call him when she was leaving. Stafford went there, but Jabbie was not at home. Stafford returned to Clackamas Town Center, where she called Jabbie, who answered and agreed to meet. Stafford went to Jabbie's apartment, and she left after about 15 minutes. While leaving, Stafford placed a call to petitioner, but he was already waiting outside. When Stafford left, petitioner went into the apartment. Shortly thereafter, Stafford heard gunshots.

Around the same time, two of Jabbie's neighbors, Alcantara and Grooms, had stepped outside their apartment to smoke cigarettes. They observed a woman whom they later identified as Stafford leave Jabbie's apartment. A minute later, they heard several gunshots. Shortly after that, they saw a Black male leave Jabbie's apartment. They did not contact the police.

Stafford returned petitioner's cell phone to him. Later, petitioner told Stafford that he had shot Jabbie in the chest and that his cousin had disassembled and disposed of the gun. On September 28, 2004, police discovered Jabbie's body. He had been shot seven times in the chest.

During their investigation, police obtained telephone records for petitioner's cell phone. They showed that calls were made to petitioner's cell phone from a payphone

located at Clackamas Town Center, and that calls were made between petitioner's two cell phones on the night of the murder using cell towers close to Clackamas Town Center.

On September 30, 2004, Stafford admitted to police that she had been at Jabbie's apartment and at Clackamas Town Center on the night of September 24. However, she denied any involvement in Jabbie's murder. About three years later, in 2007, police arrested Stafford and petitioner. Stafford agreed to testify against petitioner in exchange for dismissal of an aggravated murder charge against her.

## II.  PROCEDURAL BACKGROUND

Petitioner was charged with two counts of aggravated murder, ORS 163.095, one count of murder, ORS 163.115, and three counts of felon in possession of a firearm, ORS 166.270.[1] In 2010, a jury found him guilty on the aggravated murder and murder counts, and the court found him guilty of the remaining counts. The trial court merged the verdicts into one conviction for aggravated murder and one conviction for felon in possession of a firearm. After the penalty phase in which the jury answered the applicable questions in the affirmative, petitioner was sentenced to death. The Oregon Supreme Court, on automatic and direct review, affirmed both petitioner's conviction and sentence. *Washington*, 355 Or at 618-67.

In 2015, petitioner sought post-conviction relief. The post-conviction court denied relief, and petitioner now appeals from that judgment. Although this appeal was argued and submitted in March 2019, petitioner filed a successive petition for post-conviction relief in 2020 arguing that the death penalty was unconstitutional. In February

---

[1] The two counts of aggravated murder are based on (1) Jabbie being a witness in a criminal proceeding, and (2) petitioner committing the murder in an effort to conceal the commission of another crime or the identity of the perpetrator of the other crime, which in this case was the July burglary and assault. ORS 163.095(2)(a)(E) (2003) defined aggravated murder as a murder in which the victim was a "witness in a criminal proceeding" and the murder was "related to the performance of the victim's official duties in the justice system." ORS 163.095(2)(e) (2003) defined aggravated murder as a murder committed "in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime." The aggravated murder statute has been amended a number of times since then. *See* Or Laws 2005, ch 264, § 17; Or Laws 2012, ch 54, § 26; Or Laws 2015, ch 614, § 19, Or Laws 2019, ch 635, § 1.

2021, we granted petitioner's motion to hold this appeal in abeyance pending resolution of that successive petition.

In December 2022, then-Governor Kate Brown commuted petitioner's death sentence to life without the possibility of parole. In August 2023, in the proceeding addressing petitioner's successive petition, the post-conviction court ordered that his sentence be reduced from death to life in prison without the possibility of parole and otherwise denied relief. After the post-conviction court entered its judgment on the successive petition, we reactivated this appeal. The parties filed supplemental memoranda in which they agree that the assignments of error raised in this proceeding are not mooted by the successive post-conviction petition.[2] We agree with the parties' assessment and, thus, we turn to petitioner's arguments on appeal.

## III.   ANALYSIS

On appeal, petitioner raises four assignments of error. He argues that he received inadequate assistance of counsel relating to the investigation of whether another person killed Jabbie; he challenges whether evidence of a confession was admissible; he argues that the state failed to disclose evidence; and he contends that trial counsel failed to adequately investigate and present mitigation evidence. For the reasons explained below, we reject each of those assignments of error.

### A.   *Inadequate Assistance of Counsel*

Petitioner first argues that trial counsel was inadequate for failing to adequately investigate whether another person, Jones, killed Jabbie. We begin with a brief overview of the legal standard governing petitioner's claim.

Post-conviction relief is warranted when there has been a "substantial denial" of a petitioner's "rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void." ORS 138.530(1)(a). Petitioner has the right to adequate assistance of counsel under Article I, section 11, of

---

[2] Petitioner also moved to consolidate this appeal with the appeal from the successive petition, which we denied by order.

the Oregon Constitution, and under the Sixth and Fourteenth Amendments to the United States Constitution. The state and federal standards are similar. That is, "the standards for determining the adequacy of legal counsel under the state constitution are functionally equivalent to those for determining the effectiveness of counsel under the federal constitution." *Montez v. Czerniak*, 355 Or 1, 6-7, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014).

Under Article I, section 11, to be entitled to relief on a claim of inadequate assistance of counsel, petitioner must prove two elements, which are commonly referred to as the performance and prejudice prongs: (1) that trial counsel failed to exercise reasonable professional skill and judgment and (2) that petitioner suffered prejudice as a result. *Boswell v. State*, 305 Or App 515, 519, 469 P3d 846, *rev den*, 367 Or 387 (2020). In applying those standards, we "must make every effort to evaluate a lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight." *Lichau v. Baldwin*, 333 Or 350, 360, 39 P3d 851 (2002). It is well settled that the "constitution gives no defendant the right to a perfect defense—seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that [the lawyer] would have preferred to have avoided." *Krummacher v. Gierloff,* 290 Or 867, 875, 627 P2d 458 (1981). Nevertheless, "no type of criminal case requires more care in preparation" than cases in which a petitioner is charged with aggravated murder and in which the state is seeking the death penalty. *Johnson v Premo*, 361 Or 688, 701, 399 P3d 431 (2017).

Under the federal standard, to demonstrate ineffective assistance of counsel, a petitioner must show that trial counsel's performance "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 US 668, 688, 104 S Ct 2052, 80 L Ed 2d 674 (1984). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

In a case in which the petitioner argues that trial counsel failed to adequately investigate a trial strategy,

the test for prejudice under Article 1, section 11, is whether "there is more than a mere possibility" that counsel's failure to investigate "could have tended to affect the outcome[.]" *Richardson v. Belleque*, 362 Or 236, 266, 406 P3d 1074 (2017). "[T]he assessment involves a sequential inquiry into whether there was more than a mere possibility that an adequate investigation would have yielded information that could have been used at the [trial or hearing] in a way that gave rise to more than a mere possibility that the outcome of the proceeding could have been different as a result." *Monfore v. Persson*, 296 Or App 625, 636, 439 P3d 519 (2019) (internal quotation marks omitted).

With those standards in mind, we consider petitioner's arguments. In the post-conviction court, petitioner argued that trial counsel should have pursued the theory that Jones, not petitioner, was Stafford's partner in the murder. Trial counsel's files contained an article discussing the "SODDI defense," or the theory that "some other dude did it." In the post-conviction court, petitioner argued that trial counsel should have pursued a TODDI defense, or the theory that "that other dude did it." That "other dude" was Jones.

The post-conviction court rejected petitioner's argument that trial counsel should have investigated the TODDI defense:

"The affidavits of the trial lawyers explain that a strong TODDI defense is superior to SODDI, but they did not feel that the evidence against Jones was strong enough to carry the day, so did not pursue it. They also looked at other possible shooters but also decided that there was no one else they could successfully blame. The only person who could put [petitioner] at the scene was Stafford. If the defense could discredit her, the case was over. The issues with the cell phones could be argued—even if the phone was at the scene, anyone could have had it. The two witnesses at the apartment complex (Alcantara and Grooms) described a man who did not fit petitioner. The description was of height, weight, and race with no other details. The drawing of the suspect didn't match [petitioner]. There were no prints or other physical evidence putting [petitioner] at the scene. Instead of taking on proof of who really did the murder, the defense took on who didn't do it—the petitioner."

On appeal, petitioner renews the argument that trial counsel failed to adequately investigate whether Jones killed Jabbie.

Jones was petitioner's stepbrother. In October 2004, about three weeks after Jabbie was murdered, Jones committed suicide by shooting himself with a handgun in his bedroom. A detective's report from August 2006 listed Jones as a person of interest in the investigation of Jabbie's murder.

Trial counsel vetted Jones as a suspect, and they considered pursuing the theory that Jones had killed Jabbie. Trial counsel decided not to do so because Jones did not match a sketch of the person seen leaving Jabbie's apartment. More importantly, arguing that Jones was the shooter risked opening the door to harmful impeachment evidence, including—as explained in more detail below—evidence that petitioner said that he intended to blame Jones. Defense counsel considered showing one of the witnesses, Alcantara, a photograph of Jones, but defense counsel made the tactical decision not to do so because of the downside risks associated with the theory that Jones killed Jabbie.

Instead, trial counsel focused on the fact that the witness's sketch did not match petitioner. Witnesses had described the person seen leaving Jabbie's apartment as thin or "skinny," which did not match petitioner. Therefore, based on the specific circumstances of the case, including the lack of physical evidence linking petitioner to the murder, trial counsel made the strategic decision to attack Stafford's credibility and to pursue a SODDI defense, rather than opening the door to unfavorable evidence associated with claiming that Jones shot the victim. That strategic decision does not reflect an absence of professional skill or judgment.

In arguing that defense counsel's investigation of Jones was inadequate, petitioner points out that a police report associated with Jones's suicide described him as weighing only 125 pounds. Petitioner now argues that if trial counsel had obtained a copy of the reports associated with Jones's suicide, then they would have discovered that Jones was thin, like the person described by witnesses.

Petitioner suggests that awareness of that fact may have led trial counsel to change their defense strategy.

That argument is not persuasive because the descriptions provided by the witnesses varied and did not closely match petitioner or Jones. Although Grooms described the Black male seen leaving Jabbie's apartment as weighing only 130 pounds, she also described him as six feet tall, which is considerably taller than the reported height of Jones. In the same police report stating that Jones weighed 125 pounds, it also provides that his height was only five feet six inches. At his first interview, Alcantara, who did not speak much English, described the Black male seen leaving Jabbie's apartment as five feet eight inches to five feet ten inches tall, and as weighing 130 to 140 pounds. However, at his second interview, Alcantara described the person as considerably heavier, weighing 185 to 190 pounds. At the time of the murder, petitioner was six feet tall and weighed over 200 pounds. Although the witness descriptions did not closely match petitioner, they did not closely resemble Jones either.

A forensic artist produced a sketch of the person seen leaving Jabbie's apartment based on Alcantara's description. It did not resemble petitioner. But it did not closely resemble Jones either. For example, the person in the sketch wore glasses, and there is no indication that Jones did so.[3] More importantly, when the forensic artist made the sketch, there was confusion about whether Alcantara was describing a person who lived in an apartment above Jabbie's. Alcantara also noted in his second interview that he did not see the male suspect's face.

Therefore, considering the problems and inconsistencies in the witness descriptions, it was reasonable for trial counsel to focus on the fact that those witnesses failed to accurately identify petitioner, rather than attempting to argue that their descriptions more closely matched Jones. That tactical decision, although ultimately unsuccessful,

---

[3] Petitioner speculates that trial counsel may have compared the sketch with a photograph of the wrong person when ruling out Jones as a suspect. We decline to engage in speculation. Trial counsel's files contained a photograph of Jones. During his deposition, petitioner's trial counsel specifically described the correct photograph.

does not demonstrate an absence or suspension of professional skill and judgment. *See Pereida-Alba v. Coursey*, 356 Or 654, 662, 342 P3d 70 (2015) (post-conviction relief is not available for tactical decisions that fail if they are made with a reasonable exercise of professional skill and judgment).

There are other problems for petitioner's argument that trial counsel should have pursued the theory that Jones killed Jabbie. In April 2008, police learned that petitioner had told a jail cellmate that petitioner had killed Jabbie. Petitioner told his cellmate that the case against him relied on cell phone evidence, but petitioner intended to claim that he had loaned his cell phone to his "little brother" who had committed suicide. Thus, if petitioner had argued that Jones was the shooter, then he would have opened the door to the state's introduction of that evidence.

Furthermore, there was no evidence directly linking Jones to Jabbie's murder. Trial counsel knew that Jones may have killed himself because he was a person of interest in a shooting that occurred close to Jones's residence on October 1, 2004. Based on a photograph of Jones, the victim of the October 1 shooting identified Jones as the person who may have shot him. A ballistics report from December 2004 indicated that the gun Jones used to kill himself was also used in the October 1 shooting, but it was not used in the Jabbie murder. If petitioner's trial counsel had argued that Jones shot Jabbie, then the state could have introduced that evidence. Trial counsel made the tactical decision that opening the door to such evidence would have been "a loser" for petitioner because, if the jury was not persuaded that Jones was the shooter, then the jury would have been more likely to convict petitioner.

In seeking to connect Jones to Jabbie's murder, petitioner points to police interviews of Jones's cousin in August 2005. However, that person told detectives that petitioner had committed the murder of Jabbie, that petitioner was attempting to rob Jabbie, that Jones had not been involved, and that petitioner had attempted to persuade Jones to join his gang because petitioner was spending a lot of time with Rhonda Ford, Jones's mother. Trial counsel had that information and their decision not to rely on it was reasonable.

Petitioner also points out that, on October 28, 2004, while in jail, petitioner called Jones's mother. The notes from that telephone call provide, in part:

> "[Petitioner] calls Rhonda [Ford] and they talk about her son's suicide. She said that she thinks that he may have been afraid of going to jail because of instances in which his gun ha[d] been used. She gave the example of an incident at a store on Stark where the victim was paralyzed. She stated that she was going to call and see what instances the gun had been used in."

The incident at the store on Stark Street was the October 1 shooting close to Jones's house. Thus, the call provides little support for petitioner's argument that Jones shot Jabbie, especially given that a ballistics report indicated that the gun Jones used to kill himself had also been used in the October 1 shooting, and it had not been used in Jabbie's murder.

In the post-conviction court, petitioner provided an affidavit from Deon Jefferson, stating that it was Jones, not petitioner, who asked Jefferson to get rid of a handgun used in a robbery "gone bad" around the time of Jabbie's murder. When interviewed by police in April 2005, Jefferson said that he did not know anything about the murder of Jabbie. Jefferson was affiliated with the same gang as petitioner, and they referred to each other as cousins. In 2005, Jefferson was arrested and charged with attempted murder in an unrelated case. Defense counsel decided not to call Jefferson as a witness at petitioner's trial because they had "credibility issues with him." Based on the information in the record at the time of trial, trial counsel's decision was reasonable.

Therefore, considering the problems associated with the witness descriptions, the evidence that the state could have introduced to refute the theory that Jones killed Jabbie, and the lack of evidence directly linking Jones to Jabbie's murder, it was reasonable for trial counsel not to pursue the theory that Jones shot Jabbie. Instead, trial counsel made a reasonable tactical decision to attack Stafford's credibility, to call into question the evidence that petitioner shot Jabbie, and to pursue a "some other dude did it" defense.

Especially given the downside risks of arguing that Jones committed the murder, which would have opened the door to impeachment evidence that could have harmed petitioner, the decision not to pursue that theory did not reflect a lack of professional skill or judgment. Evaluating trial counsel's performance without the distorting effects of hindsight, we are not persuaded that it was deficient. *See Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001) (emphasizing that a court must not "second-guess a lawyer's tactical decisions in the name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment").

Petitioner also argues that the investigation of the theory that Jones shot Jabbie was inadequate or incomplete because trial counsel failed to obtain the police reports associated with Jones's suicide. *See Gorham*, 332 Or at 567 (observing that "tactical decisions must be grounded in a reasonable investigation"). Assuming, without deciding, that defense counsel should have obtained those reports, petitioner fails to demonstrate that they had a tendency to affect the outcome of the case. *See Green*, 357 Or at 323. Although they described Jones as thin, as explained above, the witness descriptions varied, and their descriptions did not match Jones's height. The reports provide that, at the time of Jones's suicide, he was upset about a fight with his girlfriend. His mother, Ford, had been with Jones in his bedroom, and she had tried to calm him down. When she left his bedroom, she heard the gunshot. Notably, at that time, Ford did not make a statement to the police suggesting any connection between her son's suicide and the Jabbie murder.

For all of the above reasons, it was reasonable for trial counsel not to pursue the theory that Jones killed the victim. Petitioner has not shown that trial counsel failed to conduct "the defense with professional skill and judgment." *Krummacher*, 290 Or at 875. Nor has he shown that obtaining the police reports associated with Jones's suicide could have changed trial counsel's assessment of that theory or otherwise affected the outcome of the case. *Richardson*, 362 Or at 265-66. Therefore, we reject petitioner's first assignment of error.

B.  *Admissibility of Ford's Statements about Jones's Confession*

In his second assignment of error, petitioner argues that the post-conviction court erred by ruling that statements about Jones's confession would have been inadmissible at trial. To support his inadequate assistance of counsel claim, petitioner submitted affidavits relating to a purported confession by Jones. Petitioner argued that trial counsel should have sought to introduce evidence of Jones's confession at his trial, but the post-conviction court ruled that the evidence would have been inadmissible at the underlying criminal trial. Petitioner now challenges the post-conviction court's ruling on appeal. As explained below, we are not persuaded that the post-conviction court erred.

Jones's mother, Ford, died on March 5, 2010, which was about three weeks before the beginning of petitioner's trial. In the post-conviction court, petitioner argued that, before Jones committed suicide, he confessed to his mother that he had killed Jabbie. Relatives of petitioner and Ford averred that, before she died, Ford had told them that Jones had told her that he killed Jabbie. The post-conviction court concluded that those statements would not have been admissible at trial in the guilt or penalty phase because they were double hearsay, they did not fall under a hearsay exception, and there were no indicia of reliability. In so ruling, the post-conviction court found that, prior to Ford's death, no one told police or the defense team about Jones's purported confession.

On appeal, petitioner acknowledges that the excluded statements were hearsay within hearsay but argues that the post-conviction court incorrectly ruled on their admissibility because the repetitiveness of what Ford said to others was sufficient to permit a finding that the out-of-court statements were trustworthy under the residual hearsay exception in OEC 803(28). *See State v. Rodriguez-Castillo*, 345 Or 39, 49-50, 188 P3d 268 (2008) (outlining the requirements for admissibility under the residual hearsay exception in OEC 803(28)).

We discern no error in the post-conviction court's evidentiary ruling. That is, after reviewing the record, the

statements regarding what Ford said about Jones's confession were inadmissible. Generally, courts admit hearsay "very rarely in exceptional cases where the particular circumstances of the declarant and the out-of-court statement are demonstrably trustworthy." *State v. Cazares-Mendez*, 350 Or 491, 512, 256 P3d 104 (2011) (internal quotation marks omitted); *see State v. Edwards-Peecher*, 218 Or App 311, 319, 179 P3d 746 (2008) (concluding that the defendant failed to establish corroborating circumstances that clearly indicated the trustworthiness of a statement made by the defendant's son to the defendant's investigator that the son had committed the crime).

The circumstances of Ford's statements lack the equivalent guarantees of trustworthiness required for admission under the residual hearsay exception. We note, for example, that Ford did not mention her son's confession to petitioner when petitioner called her from jail in October 2004. Petitioner points out that his sister told a mitigation specialist that Jones might have been involved in Jabbie's murder, and that the defense should contact Jones's mother. Petitioner and Stafford were arrested for Jabbie's murder in 2007, and the trial did not occur until 2010, but Ford did not reach out to petitioner's trial counsel during that time, which calls into question the trustworthiness of the double-hearsay statements. Because we agree with the post-conviction court's ruling that those statements would not have been admissible during the underlying criminal trial, we reject petitioner's second assignment of error.

C.  *Failure to Disclose Police Reports*

In the post-conviction court, petitioner argued that the state violated *Brady v. Maryland*, 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963), by failing to disclose police reports indicating that Jones was involved in a "violent crime spree" during the week before Jabbie's murder. The post-conviction court rejected that argument, explaining that petitioner "was not involved in any of the incidents with Jones. Jabbie was not connected to any of those incidents. Jones was never convicted on any of those crimes. The reports were not exculpatory of petitioner."

Under *Brady*, "a prosecutor's withholding of favorable evidence from a criminal defendant 'violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Eklof v. Steward*, 360 Or 717, 719, 385 P3d 1074 (2016) (quoting *Brady*, 373 US at 87). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 US 667, 682, 105 S Ct 3375, 87 L Ed 2d 481 (1985).

Here, assuming without deciding that the state's failure to disclose police reports associated with Jones constituted a substantial denial of petitioner's rights, we conclude that petitioner has failed to show prejudice as a result of that failure. *See Turner v. United States*, 582 US 313, 326, 137 S Ct 1885, 198 L Ed 2d 443 (2017) (concluding that the undisclosed evidence in the context of the entire record was "too little, too weak, or too distant from the main evidentiary points to meet *Brady*'s standards"). This is not a case, for example, in which defense counsel was unaware of Jones as a potential suspect. Instead, trial counsel considered arguing that Jones was the shooter but ruled him out. Having reviewed the police reports associated with Jones, we are not persuaded that they might have had an impact on that decision because they describe incidents that have no discernible connection to either petitioner or Jabbie. Therefore, petitioner has not established a reasonable probability that the outcome of the trial would have been different if the state had disclosed those reports to trial counsel. Accordingly, petitioner's third assignment of error provides no basis to reverse the post-conviction court's judgment.

D.   *Investigation and Presentation of Mitigation Evidence*

In the post-conviction court, petitioner argued that trial counsel provided inadequate assistance of counsel by failing to conduct a thorough investigation and present adequate mitigation evidence during the penalty phase of petitioner's trial. To support his post-conviction claim, petitioner submitted a series of records to the post-conviction court that were not submitted during the penalty phase.

Trial counsel retained two mitigation specialists who examined petitioner's history and compiled information about his troubled childhood. During the penalty phase, a number of witnesses—including petitioner's mother, cousin, uncle, and sisters—testified regarding petitioner's difficult childhood and adolescence. Petitioner's mother testified that he was born while she was incarcerated, and she explained that his father used and sold drugs and was abusive. Petitioner's sisters also testified regarding petitioner's difficult childhood and their father's abusive behavior. During the penalty phase, thirteen lay witnesses and a forensic psychologist provided testimony on petitioner's behalf.

In rejecting petitioner's argument, the post-conviction court concluded that petitioner failed to prove both deficient performance and prejudice. On deficient performance, the court explained that most of the additional records concerned petitioner's parents and siblings and concluded that it was "highly unlikely" that those records would have been relevant or admissible in the penalty phase. In concluding that petitioner failed to prove prejudice, the court observed that "[m]uch of the same information was testified to, without objection, by the family. [Petitioner's] own records from the juvenile system, the Oregon parole board and the Circuit Court were covered in testimony." Petitioner renews his arguments on appeal.

On appeal, petitioner argues that trial counsel should have obtained additional records to develop a more complete social history. Even assuming without deciding that those additional records would have been relevant and admissible, petitioner fails to identify specific information that trial counsel failed to present or how it had a tendency to affect the outcome. That is, we are not persuaded that trial counsel's preparation and presentation of mitigation evidence was deficient or prejudicial. *See Montez*, 355 Or at 24 (observing that the "fact that petitioner would, in retrospect, have implemented his mitigation defense in one or more different ways is not a ground for post-conviction relief if counsel acted reasonably in presenting the defense that they did"); *see also Wiggins v. Smith*, 539 US 510, 533, 123 S Ct 2527, 156 L Ed 2d 471 (2003) (explaining that trial

counsel is not required "to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing").

Affirmed.